## COMMONWEALTH vs. MICHAEL CLARKE.

Suffolk. February 8, 2011. - June 17, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Practice, Criminal,* Retroactivity of judicial holding, Assistance of counsel, Plea. *Constitutional Law,* Assistance of counsel. *Alien.*

This court concluded that the United States Supreme Court's holding in *Padilla* v. *Kentucky*, 130 S. Ct. 1473 (2010), applies retroactively on collateral review of guilty pleas obtained after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, where the holding was not the creation of a new rule but, rather, an application of an established constitutional standard on a case-by-case basis. [34-45]

A Superior Court judge did not err in denying a criminal defendant's second motion for a new trial, in which the defendant sought to vacate guilty pleas that he entered in 2005, on the ground that he was deprived of his right under the Sixth Amendment to the United States Constitution to the effective assistance of counsel due to defense counsel's failure to advise the defendant that a consequence of his guilty pleas likely would be deportation, where the defendant made an insufficient showing that had he been properly informed of the immigration consequences of his guilty pleas, there was a reasonable probability that the result of the proceeding would have been different. [45-49]

COMPLAINT received and sworn to in the Dorchester Division of the Boston Municipal Court Department on February 17, 2004.

A motion for a new trial, filed on April 14, 2010, was heard by *Rosalind Henson Miller*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas M. Glynn* for the defendant.

*Anna E. Kalluri*, Assistant District Attorney, for the Commonwealth.

*Wendy S. Wayne, Jeanette Kain, & Jennifer Klein*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

CORDY, J. This case is before us on appeal from the denial of the defendant's second motion for a new trial in which he sought to vacate guilty pleas he entered in 2005, on the ground that he was deprived of his right under the Sixth Amendment to the United States Constitution to the effective assistance of counsel as that right recently has been explicated in *Padilla* v. *Kentucky*, 130 S. Ct. 1473 (2010) (*Padilla*). In *Padilla*, the United States Supreme Court held that defense counsel's failure to advise a client that a consequence of his guilty plea likely would be deportation constituted ineffective assistance of counsel. *Id.* at 1483. The defendant asserts that he was similarly ill served by his counsel and asks us to vacate his guilty pleas. We transferred the case to this court on our own motion.

To decide this case, we must determine whether *Padilla* applies retroactively to the defendant's collateral challenge to his convictions, and, if so, whether he has demonstrated that he was prejudiced by counsel's shortcomings. For the reasons that follow, we conclude that *Padilla* is to be applied retroactively on collateral review of guilty pleas obtained after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 (eff. April 1, 1997). We also conclude that the defendant has made an insufficient showing that had he been properly informed of the immigration consequences of his guilty pleas, there is a reasonable probability that the result of the proceeding would have been different. Therefore, we affirm the denial of his motion for a new trial.

1. *Facts.* The following facts are drawn from the motion judge's findings of fact and the incident report filed by the police. On February 16, 2004, two Boston police officers were monitoring the Mattapan Square area of Boston when they observed a group of teenagers standing at the corner of Babson Street and Crossman Street. As they drove by, the defendant made eye contact with one officer and then began walking away from the group. The officers turned their vehicle around and noticed the defendant standing on the front porch of a house with his hands in his pockets. The officers pulled up to the home and asked the defendant if they could speak with him. The defendant met the officers on the sidewalk, and the officers noticed a strong odor of alcohol. The defendant admitted to

drinking and that he was only seventeen years of age. The defendant stated that his friend lived at the home, but a resident in the home denied knowing the defendant. One officer conducted a patfrisk of the defendant out of concern that he might have a weapon and found two small bottles of brandy. The officers placed the defendant under arrest for being a minor in possession of alcohol. A search incident to arrest of the defendant revealed multiple bags of "crack" cocaine and marijuana, a cellular telephone, and $1,115 in cash.[1] The arrest took place 339 feet from the Mildred Middle School property line. During the booking procedure, after being read his Miranda rights, the defendant stated that the marijuana was packaged as "dime-bags, $10.00 each" and that the crack cocaine was packaged in "$10.00 rocks."

On February 2, 2005, the defendant pleaded guilty to possession of a class B substance with intent to distribute, G. L. c. 94C, § 32A; possession of a class D substance with intent to distribute, G. L. c. 94C, § 32C; and underage possession of liquor, G. L. c. 138, § 34C. In return, the Commonwealth agreed to the dismissal of two counts of school zone violations, G. L. c. 94C, § 32J, each of which carried a mandatory minimum two-year house of correction sentence and, if charged in an indictment, a maximum fifteen-year prison term. The defendant was sentenced to two years in a house of correction, with five months to be served and the balance suspended, and two years' probation.

On December 15, 2009, the United States Department of Homeland Security served the defendant with a notice to appear, stating that he was subject to removal from the United States for being convicted of an aggravated felony and for being convicted of a violation of a law relating to a controlled substance.[2] This prompted the defendant to file his first motion

---

[1]The defendant brought a motion to suppress this evidence in the Dorchester Division of the Boston Municipal Court. After an evidentiary hearing, the motion was denied.

[2]Possession with intent to distribute a class B controlled substance, G. L. c. 94C, § 32A, and possession with intent to distribute a class D controlled substance, G. L. c. 94C, § 32C, are both aggravated felonies within the meaning of 8 U.S.C. § 1101(a)(43)(B) (2006). In the notice to appear, the United States Department of Homeland Security only referenced the defendant's conviction for possession of a class B substance with intent to distribute, as subjecting him to removal from the United States.

for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), in which he sought to withdraw his guilty pleas on the ground that they were not knowing and voluntary because he did not understand the intent element of the crimes. That motion was denied on February 9, 2010.[3] On April 14, 2010, the defendant filed his second motion for a new trial, this time alleging ineffective assistance of counsel under *Padilla.*

In support of his second motion, the defendant filed an affidavit of counsel who represented him at the plea hearing, in which she averred that she had been unaware that the defendant was not a United States citizen, and had no memory of discussing any immigration consequences that might arise from his pleas of guilty. The defendant also submitted an affidavit stating that he was not told that his guilty pleas would result in deportation. Although the tape recording of the plea hearing was no longer available,[4] the docket sheet in the case bears the stamp: "Deportation Warning Given," and the court file includes a tender of plea form, signed by the defendant, which states: "I understand that if I am not a citizen of the United States, conviction of this offense may have the consequences of deportation . . . ." The tender of plea also bears the judge's signed certification that "the defendant was informed and advised that if he or she is not a citizen of the United States, a conviction of the offense with which he or she was charged may have the consequences of deportation," as well as defense counsel's signature certifying that she had explained this provision (and other provisions) of the law to the defendant.[5] The judge denied the defendant's second motion for a new trial without a written decision.

---

[3]The defendant filed a motion to reconsider, which was denied on March 15, 2010.

[4]The defendant's current counsel submitted an affidavit stating that the clerk's office informed him that the tape recording of the plea hearing had been destroyed pursuant to Rule 211 (A) (4) of the Special Rules of the District Courts (LexisNexis 2010-2011) (tape recordings properly destroyed after two and one-half years).

[5]In addition to the written certifications on the tender of plea form, the judge, before accepting a guilty plea, must also orally advise the defendant that a guilty plea may have consequences of deportation. G. L. c. 278, § 29D. The defendant does not contend that he was not so advised.

2. *Retroactivity*. Because the decision in *Padilla* came after the defendant's convictions were final, we must determine whether the holding in that case applies retroactively to cases on collateral review.[6] Federal law on the retroactive application of constitutional decisions was articulated in *Teague* v. *Lane*, 489 U.S. 288 (1989) (*Teague*).[7] In that case, the Supreme Court held that a "new" constitutional rule of criminal law does not apply on collateral review to convictions that were final before the new rule was announced.[8] *Id.* at 301. "Under the *Teague*

---

[6] No circuit court of the United States Court of Appeals or State high court has ruled on whether *Padilla* v. *Kentucky*, 130 S. Ct. 1473 (2010) (*Padilla*), applies retroactively. Other courts are split on the question. A slight majority of these courts has concluded that *Padilla* is not a "new rule" but merely an application of *Strickland* v. *Washington*, 466 U.S. 668 (1984) (*Strickland*), and thus applies retroactively on collateral review. See United States *vs.* Zhong Lin, Criminal Action No. 3:07-CR-44-H (W.D. Ky. Jan. 20, 2011); Martin *vs.* United States, No. 09-1387 (C.D. Ill. Aug. 25, 2010); *United States* v. *Chaidez*, 730 F. Supp. 2d 896, 898-904 (N.D. Ill. 2010); United States *vs.* Hubenig, No. 6:03-mj-040 (E.D. Cal. July 1, 2010); Al Kokabani *vs.* United States, Nos. 5:06-CR-207-FL & 5:08-CV-177-FL (E.D.N.C. July 30, 2010). But see Thai Hong Doan *vs.* United States, Criminal Nos. 1:06cr463, 1:06cr525; Civil Nos. 1:08cv958, 1:08cv959 (E.D. Va. Jan. 4, 2011); United States *vs.* Hough, No. 2:02-cr-00649-WJM-1 (D.N.J. Dec. 17, 2010); United States *vs.* Gilbert, No. 2:03-cr-00349-WJM-1 (D.N.J. Oct. 19, 2010); *Miller* v. *State*, 196 Md. App. 658, 659-676 (2010).

[7] We adopted *Teague* v. *Lane*, 489 U.S. 288 (1989) (*Teague*), in *Commonwealth* v. *Bray*, 407 Mass. 296, 300-301 (1990), but the Supreme Court has since made clear that States are not constrained by the analysis of *Teague*, and may allow broader application of new constitutional rules than that mandated by Federal law. *Danforth* v. *Minnesota*, 552 U.S. 264, 288 (2008). While some State appellate courts have chosen to deviate from *Teague*, see, e.g., *State* v. *Smart*, 202 P.3d 1130, 1138-1140 (Alaska 2009), we have yet to consider whether we should accept the invitation of the Supreme Court and adopt a broader application of new constitutional rules. Because we conclude that *Padilla* is retroactive even under *Teague*, we need not consider the question today.

[8] There are two exceptions to the rule announced in *Teague*. A new constitutional rule will apply retroactively if it (1) places certain primary conduct outside of what can be prohibited by use of the criminal law; or (2) requires the observance of procedures "implicit in the concept of ordered liberty." *Teague*, *supra* at 310-311, quoting *Mackey* v. *United States*, 401 U.S. 667, 693 (1971) (Harlan, J., concurring in part and dissenting in part). No court has found that either of the *Teague* exceptions is applicable to *Padilla*. The first exception does not apply because the decision concerns counsel's duty to inform a client about immigration consequences and does not place any conduct outside the realm of criminal behavior. See *Teague*, *supra* at 311. The second exception is reserved only for "watershed rules of criminal

framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review." *Whorton* v. *Bockting*, 549 U.S. 406, 416 (2007).

The Supreme Court in *Teague* acknowledged the difficulty of determining when a rule is new, and chose not to define a "new rule" except to state that, "[i]n general, . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. . . . To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." (Citations omitted.) *Teague*, *supra* at 301. In fairness, the Supreme Court, since *Teague*, has given broad articulation to the meaning of when a rule is "new," thus limiting review in collateral challenges, and "validat[ing] reasonable, good-faith interpretations of existing precedents made by state courts" even though they are "contrary to later decisions." *Butler* v. *McKeller*, 494 U.S. 407, 414 (1990). See *Beard* v. *Banks*, 542 U.S. 406, 411 (2004), quoting *Graham* v. *Collins*, 506 U.S. 461, 468 (1993) (court must ascertain "legal landscape" existing at time conviction became final); *O'Dell* v. *Netherland*, 521 U.S. 151, 156 (1997) ("we will not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court"); *Graham* v. *Collins*, *supra* at 467, quoting *Saffle* v. *Parks*, 494 U.S. 484, 488 (1990) (holding is new and thus not ordinarily retroactive "unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor").

It is thus not surprising that the Commonwealth argues that the rule announced in *Padilla* is a "new" rule because it was not "dictated" by precedent and "abrogated both widespread federal and stated precedent." Indeed, in concluding that defense counsel was ineffective by failing to advise her client of the virtually automatic deportation consequences of his guilty plea,

procedure," *id.*, and has never been applied by the Supreme Court. See *United States* v. *Mandanici*, 205 F.3d 519, 528-529 (2d Cir. 2000) (collecting Supreme Court cases rejecting second *Teague* exception).

the Supreme Court in *Padilla* effectively changed the law in the nine circuit courts of the United States Court of Appeals that had previously addressed the issue. See *Broomes* v. *Ashcroft*, 358 F.3d 1251 (10th Cir.), cert. denied, 543 U.S. 1034 (2004); *United States* v. *Fry*, 322 F.3d 1198 (9th Cir. 2003); *United States* v. *Gonzalez*, 202 F.3d 20 (1st Cir. 2000); *United States* v. *Banda*, 1 F.3d 354 (5th Cir. 1993); *United States* v. *Del Rosario*, 902 F.2d 55 (D.C. Cir. 1990); *United States* v. *George*, 869 F.2d 333 (7th Cir. 1989); *United States* v. *Yearwood*, 863 F.2d 6 (4th Cir. 1988); *United States* v. *Campbell*, 778 F.2d 764 (11th Cir. 1985); *United States* v. *Santelises*, 476 F.2d 787 (2d Cir. 1973).

However, as the Supreme Court has also stated: "Even though we have characterized the new rule inquiry as whether 'reasonable jurists' could disagree as to whether a result is dictated by precedent, the standard for determining when a case establishes a new rule is 'objective,' and the mere existence of conflicting authority does not necessarily mean a rule is new." *Williams* v. *Taylor*, 529 U.S. 362, 410 (2000), quoting *Wright* v. *West*, 505 U.S. 277, 304 (1992) (O'Connor, J., concurring). Of particular relevance to the claim of ineffective assistance of counsel raised in *Padilla*, Justice Kennedy has noted that it may be harder to find a "new rule" in a case where the existing precedent established a general standard that can only be applied after analysis of the facts of a given case:

> "Whether the prisoner seeks the application of an old rule in a novel setting . . . depends in large part on the nature of the rule. If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule . . . . Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." (Citations omitted.)

*Wright* v. *West, supra* at 308-309 (Kennedy, J., concurring).[9]

_____

[9] In *Wright* v. *West*, 505 U.S. 277 (1992) (*Wright*), the defendant challenged

See *Williams* v. *Taylor, supra* at 382. Reflecting this same view, the Supreme Court, in *Bousley* v. *United States,* 523 U.S. 614, 619-620 (1998), rejected an invitation to find that *Teague* barred a defendant's claim that his plea was not voluntary because he was misinformed about the elements of a crime, concluding that "[t]he only constitutional claim made here is that petitioner's guilty plea was not knowing and intelligent. There is surely nothing new about this principle . . . ." *Id.* at 620.

With this framework in mind, we look more specifically to the holdings and reasoning of *Padilla* and of the watershed Sixth Amendment case of *Strickland* v. *Washington,* 466 U.S. 668 (1984) (*Strickland*), on which it relies. There is no question that the holding in *Padilla* is an extension of the rule in *Strickland,* which articulated the two steps required for establishing ineffective assistance of counsel:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense."

*Id.* at 687. See *Padilla, supra* at 1482-1483. Nor is there any question that the Supreme Court was applying the first prong of the *Strickland* standard when it concluded that the failure of counsel to provide her client with available advice about an issue like deportation was constitutionally deficient.

---

the sufficiency of the evidence for a conviction, and the focus of the splintered opinions of the Justices was the appropriate standard of review of mixed questions of law and fact on a writ of habeas corpus. The *Teague* question in the *Wright* case was whether the defendant's claim relied on *Jackson* v. *Virginia,* 443 U.S. 307, 313-324 (1979), which held that a habeas proceeding in a Federal court examining a claim of insufficient evidence must ask whether any rational fact finder could have concluded that the defendant was guilty beyond a reasonable doubt after viewing all the evidence, or on more recent precedent that dealt specifically with the evaluation of evidence in cases involving possession of stolen goods (in other words, whether the latter case was a "new rule"). *Wright, supra* at 310-316 (Souter, J., concurring) (arguing defendant's claim was barred by *Teague*). In *Wright,* Justice Kennedy wrote that *Jackson* v. *Virginia, supra,* was an example of a precedent whose application would rarely generate a "new rule," because "[b]y its very terms it provides a general standard which calls for some examination of the facts." *Wright, supra* at 308 (Kennedy, J., concurring).

It is important, therefore, to review the precise way in which *Strickland* governs ineffective assistance claims. In that case, the Supreme Court concluded that the proper standard for constitutionally adequate representation was "reasonably effective assistance," and that to prevail on a claim of constitutional ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687, 688. A court faced with such a claim must inquire "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. Although in its *Strickland* decision the Supreme Court listed certain "basic duties" of an attorney such as avoiding conflicts of interest and keeping a client informed of developments in the prosecution, it declined to define the constitutional obligations of counsel in more specific terms, *id.* at 688, stating:

> "More specific guidelines are not appropriate. The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. . . . The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (Citations omitted.)

*Id.* The Supreme Court went on to explain that a court reviewing an ineffective assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

Thus, the *Strickland* case "[b]y its very terms . . . provides a general standard which calls for some examination of the facts." *Wright* v. *West, supra* at 308 (Kennedy, J., concurring). The beginning point is a rule of general application designed for the specific purpose of evaluating a myriad of factual contexts. *Id.* at 308-309 (Kennedy, J., concurring). The Supreme Court's analysis in subsequent cases applying *Strickland* lends further support to the proposition that such claims present the sort of

case-by-case application of a general standard that will rarely create a "new rule."[10]

In *Williams* v. *Taylor, supra* at 390, the Supreme Court held that the question whether the defendant was seeking to apply a "rule of law that was clearly established" when his conviction became final was "easily answered because the merits of his claim are squarely governed by our holding in *Strickland.*"[11] The Supreme Court explained: "That the *Strickland* test 'of necessity requires a case-by-case examination of the evidence,' obviates . . . neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court." *Id.* at 391, quoting *Wright* v. *West, supra* at 308 (Kennedy, J., concurring). See *Osagiede* v. *United States,* 543 F.3d 399, 408 n.4 (7th Cir. 2008), quoting *Wright* v. *West, supra* (Kennedy, J., concurring) (holding that, although petitioner cited no case where *Strickland* claims had succeeded under particular theory, application of *Strickland* in novel context did not create new rule). The Supreme Court then used the language of retroactivity analysis: "This Court's precedent 'dictated' that the Virginia Supreme Court apply the *Strickland* test . . . . And it can hardly be said that recognizing the right to effective counsel 'breaks new ground or imposes a new obligation on the States.' " *Williams* v. *Taylor, supra,* quoting *Teague, supra* at 301. The Court noted that "the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims." *Williams* v. *Taylor, supra.*

The Supreme Court's decision in *Roe* v. *Flores-Ortega,* 528 U.S. 470, 484 (2000) (*Flores-Ortega*), also illustrates that

---

[10]"In cases in which prisoners argue that they were denied effective representation in state court . . . the Court routinely assumes without discussion that the doctrine announced in *Strickland* v. *Washington,* 466 U.S. 668, 687 (1984), counts as an old rule, apart from the application of that doctrine to the circumstances." Yackle, State Convicts and Federal Courts: Reopening the Habeas Corpus Debate, 91 Cornell L. Rev. 541, 549-550 n.46 (2006).

[11]In *Williams* v. *Taylor,* 529 U.S. 362, 367, 379 (2000), the question presented was not whether a "new rule" was involved for purposes of retroactivity under *Teague,* but a related question — whether the State court's decision on the merits of the petitioner's ineffective assistance of counsel claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," thus permitting habeas relief under 28 U.S.C. § 2254(d)(1) (2006).

particular applications of *Strickland* are not necessarily "new rules," even when the Court resolves conflicting authority. In that case, the Supreme Court settled a conflict among some of the circuit courts of the United States Court of Appeals regarding the obligations of counsel to inform their clients about their appellate rights. *Id.* at 476. The First and Ninth Circuits had adopted a bright line rule that constitutionally effective counsel must file a notice of appeal unless the defendant specifically instructs otherwise and failing to do so was "per se deficient." *Id.* at 478. The Supreme Court rejected the bright line rule as inconsistent with *Strickland*'s holding that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.*, quoting *Strickland, supra* at 688.[12] Despite the existence of conflicting authority prior to the Court's decision, and the relative specificity of the rule that the Supreme Court laid out,[13] courts that have considered the question have found that *Flores-Ortega* did not announce a new rule. See *Tanner* v. *McDaniel*, 493 F.3d 1135, 1143-1144 (9th Cir. 2007) ("Each time that a court delineates what 'reasonably effective assistance' requires of defense attorneys with respect to a particular aspect of client representation, see *Strickland,* [*supra* at 687], it can hardly be thought to have created a new principle of constitutional law"); *Frazer* v. *South Carolina*, 430 F.3d 696, 704-705 (4th Cir. 2005) ("*Flores-Ortega* simply crystalizes the application of *Strickland* to the specific context presented by [the defendant's] claim"); *Lewis* v. *Johnson*, 359

---

[12]The Supreme Court also held that the Ninth Circuit had misapplied the prejudice prong, and stated, citing *Strickland* and other cases: "Today, drawing on that line of cases and following the suggestion of the Solicitor General, we hold that when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Roe* v. *Flores-Ortega*, 528 U.S. 470, 484 (2000). Without citing *Teague*, the Supreme Court asserted that this standard, "breaks no new ground." *Id.* at 485.

[13]"We have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. . . . [C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* at 477-480.

F.3d 646, 655 (3d Cir. 2004) (*Strickland* is "rule of general applicability," and identification of *"particular* duty," to consult regarding appeal options, is not basis for classifying rule as "new"). But see *Daniel* v. *Cockrell,* 283 F.3d 697, 708 (5th Cir.), cert. denied, 537 U.S. 874 (2002) (appearing, without discussion, to assume that *Flores-Ortega* created new rule, but finding that case was inapplicable).

A conclusion that *Padilla* is not a "new rule" but merely an application of *Strickland* is also informed by the reasoning and language of the *Padilla* decision itself.[14] The Court began its discussion of constitutional effectiveness by chronicling the extensive changes in immigration law in the past decades, from a system where deportation was rare and often preventable by a favorable exercise of judicial or administrative discretion, to a system where deportation is a near-mandatory consequence of many convictions. *Padilla, supra* at 1478-1480. As a result of these consequences, "[t]he importance of accurate legal advice for noncitizens accused of crimes has never been more important." *Id.* at 1480. The Court cited the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 (effective April 1, 1997) (IIRIRA), as pivotal, and the point at which, "if a noncitizen has committed a removable offense . . . , his removal is practically inevitable . . . ." *Id.* at 1480. IIRIRA "eliminated the Attorney General's authority to grant discretionary relief from deportation, an authority that had been exercised to prevent the deportation of over 10,000 noncitizens during the 5-year period prior to 1996." *Id.,* citing IIRIRA. Coupled with an expansive class of deportable offenses, see *Padilla, supra* at 1478-1480, enactment of IIRIRA "dramatically raised the stakes of a noncitizen's criminal conviction." *Id.* at 1480. Thus, the Supreme Court concluded that "deportation is an integral part — indeed, sometimes the most important part — of the penalty that may be imposed on noncitizen defendants who plead guilty to specific crimes." *Id.*

---

[14]While the fact that the Court holds its decision is controlled by a prior decision does not definitively answer the question whether the Court articulated a "new rule," *Butler* v. *McKellar,* 494 U.S. 407, 415 (1990), the Supreme Court's analysis in *Padilla* is relevant to understanding the relationship between *Strickland* and *Padilla.*

Where the Supreme Court of Kentucky (in *Padilla*) declined to consider the increasing importance of the severe immigration consequences arising from criminal convictions by labeling deportation from the United States as "collateral consequences" of a criminal conviction to which the representation required by the Sixth Amendment, and interpreted in *Strickland*, did not extend, the Supreme Court pointed out that the distinction between "collateral" and "direct" consequences had never been made in its Sixth Amendment jurisprudence and is not well suited to evaluating deportation, a consequence which is so "intimately related to the criminal process." *Id.* at 1481-1482. Consequently, the Supreme Court concluded that advice about deportation is not categorically removed from the Sixth Amendment's right to counsel. *Id.* at 1482.

Finding *Strickland* applicable, the Supreme Court went on to apply *Strickland* to the context of advice about immigration consequences. *Id.* at 1482-1483. Noting that the standard for constitutionally deficient representation was "necessarily linked to the practice and expectations of the legal community," *id.* at 1482, the Court cited to numerous practitioner sources and a prior Supreme Court case, *Immigration & Naturalization Serv.* v. *St. Cyr*, 533 U.S. 289 (2001), as evidence that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Padilla*, *supra* at 1482. In the case of the defendant in *Padilla*, the removal statute made clear that a conviction would make him removable, and his counsel affirmatively misadvised him, making it an easily identified case of deficient representation. *Id.* at 1483. However, in light of the prevailing norms it had recognized and described, the Court went further to articulate more specifically the requirements of constitutionally adequate counsel in the representation of noncitizens facing immigration law consequences:

> "When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear."

*Id.*

Rejecting the invitation to limit its holding to cases of affirmative misadvice, the Supreme Court noted that such a rule would encourage attorneys to be silent as to these consequences, *id.* at 1484, and concluded: "It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.' " *Id.*, quoting *Hill* v. *Lockhart*, 474 U.S. 52, 62 (1985) (White, J., concurring) (*Hill*). This is the definitive application of an established constitutional standard on a case-by-case basis, incorporating evolving professional norms (on which the standard relies) to new facts. It is not the creation of a new constitutional rule.

A fair reading of the Supreme Court's opinion in *Padilla* also suggests that the Justices themselves assumed that their holding would be retroactively applied. For example, the Court's opinion spoke specifically to the Solicitor General's concern that its decision would open the "floodgates" and disturb the finality of convictions, *id.* at 1484, in terms that would have been superfluous if the holding were not applicable to convictions already final. *Id.* at 1485 ("It seems unlikely that our decision today will have a significant effect on those convictions already obtained as the result of plea bargains"). See, e.g., United States *vs.* Hubenig, No. 6:03-mj-040 (E.D. Cal. July 1, 2010); *People* v. *Ramirez*, 29 Misc. 3d 1201(A) (N.Y. Crim. Ct. 2010). The Court pointed out that as a practical matter its ruling would not undermine the finality of large numbers of convictions that had already been obtained by plea bargains for several reasons. First, because for "at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea." *Padilla, supra* at 1485.[15] Second, because in the then twenty-five years since *Strickland*, claims of ineffective assistance of counsel at the plea stage are far "less frequently the subject of collateral

---

[15]This appears to have been the case in the Commonwealth. As noted by the Committee for Public Counsel Services (CPCS) in its amicus brief, since 1988, it has required all staff attorneys and bar advocates in Massachusetts to advise a defendant client of the immigration consequences of his or her criminal case. General Policies Applicable to all Assigned Counsel, CPCS Performance Standards Governing Representation of Indigents in Criminal Cases § 5.4(o) (rev. 2004).

challenges than convictions obtained after a trial," in large measure because the relief to be obtained, a new trial, "imposes its own significant limiting principle" — the loss of the benefit of the bargain obtained through the plea. *Padilla, supra.* Third, because to obtain relief under *Strickland,* the defendant must also meet the high bar of demonstrating prejudice resulting from counsel's below-standard performance, that is, "that a decision to reject the plea bargain would have been rational under the circumstances." *Id.*

In sum, the opinion in *Padilla* relies primarily on citation to *Strickland* itself; *Strickland* controls ineffective assistance claims by providing a broad rule of reasonableness grounded in professional norms and applied with regard to the factual circumstances of each case. See *Wright* v. *West,* 505 U.S. 277, 308-309 (1992) (Kennedy, J., concurring); *United States* v. *Chaidez,* 730 F. Supp. 2d 896, 901 (N.D. Ill. 2010). In asking the Court to rule that the affirmative misadvice that he received from his lawyer presented a case of ineffectiveness, the defendant in *Padilla* sought only an application of *Strickland* that several courts had already reached. See *Padilla, supra* at 1493-1494 n.4 (Alito, J., concurring). Although the Court articulated its holding more broadly, in what Justice Alito believed was a "dramatic departure from precedent," *id.* at 1488 (Alito, J., concurring), it simply held that, given the growing importance of immigration consequences of criminal convictions, reasonable attorneys following professional standards would not fail to advise their clients of these consequences and ultimately concluded that a failure to notify a defendant about immigration consequences clearly satisfies *Strickland*'s test for ineffectiveness. See *id.* at 1484. Finally, the Court plainly contemplated collateral challenges to prior guilty pleas based on its ruling.[16]

---

[16]A few days after its decision in *Padilla,* the Supreme Court remanded a case for further consideration in light of *Padilla. Santos-Sanchez* v. *United States,* 130 S. Ct. 2340 (2010). That case, too, was on collateral review and the conviction had become final before the Court's decision in *Padilla.* The defendant, after being placed in removal proceedings as a result of a Federal conviction, sought a writ of coram nobis on the ground that his counsel was ineffective for misrepresenting the immigration consequences of his plea. See *Santos-Sanchez* v. *United States,* 548 F.3d 327, 336 (5th Cir. 2008) (finding defendant's counsel not required to inform him of immigration consequences of guilty plea).

For these reasons, we conclude that the holding in *Padilla* is to be applied retroactively to criminal convictions obtained after the effective date of IIRIRA, April 1, 1997, the point at which deportation became "intimately related to the criminal process" and "nearly an automatic result for a broad class of noncitizen offenders." *Padilla, supra* at 1481. We now turn to whether the defendant has sufficiently proved ineffective assistance of counsel.

3. *Ineffective assistance of counsel.* The standard for ineffective assistance of counsel in Massachusetts was articulated in *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). Since the Supreme Court's decision in *Strickland,* we have held that satisfying the *Saferian* standard necessarily satisfies *Strickland. Commonwealth* v. *Fuller,* 394 Mass. 251, 256 n.3 (1985) ("Consideration of the Massachusetts test of ineffective assistance of counsel . . . leads us to the conclusion that if the *Saferian* test is met, the Federal test is necessarily met as well"). We must determine "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian, supra.*

The defendant asserts that he was never told of the immigration consequences of his plea. He has presented an affidavit of his counsel at the plea hearing, stating that she was not aware that the defendant was not a United States citizen and had no memory of discussing immigration consequences with him. The Commonwealth argues that the defendant's evidence is insufficient to show that he was not advised of the deportation consequences of his guilty pleas.

Under *Padilla,* "[constitutionally competent] counsel must inform her client whether his plea carries a risk of deportation." *Padilla, supra* at 1486. Central to the Court's decision was its reference to the professional standards of the legal community. *Id.* at 1482-1483. National and Massachusetts performance guidelines require criminal defense counsel to interview a defendant and gather significant personal information in order to represent

him. See National Legal Aid and Defender Ass'n, Performance Guidelines for Criminal Representation § 2.2(b)(2) (1995); General Policies Applicable to all Assigned Counsel, CPCS Performance Standards Governing Representation of Indigents in Criminal Cases, §§ 2.2, 4.1, 5.4(o) (rev. 2004). As the Court in *Padilla* recognized, national guidelines also "support[] the view that counsel must advise her client regarding the risk of deportation." *Padilla, supra* at 1482, citing National Legal Aid and Defender Ass'n, Performance Guidelines for Criminal Representation, *supra* at § 6.2.

Here, as in *Padilla*, the consequences of the defendant's plea were clear. See *id.* at 1483. Pursuant to 8 U.S.C. § 1227(a)(2)(B)(i) (2006 & Supp. III 2009), "Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, . . . other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable." The defendant pleaded guilty to possession of a class B substance, to wit, crack cocaine, with intent to distribute, G. L. c. 94A, § 32A, and possession of a class D substance, to wit, marijuana, with intent to distribute, G. L. c. 94C, § 32C, either of which made him subject to deportation under 8 U.S.C. § 1227(a)(2)(B)(i). That the defendant's counsel failed to ascertain that the defendant was not a United States citizen may be sufficient to satisfy the first prong of the *Saferian* standard because effective representation requires counsel to gather at least enough personal information to represent him. As the Supreme Court in *Padilla* recognized, "[i]t is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.'" *Padilla, supra* at 1484. If counsel was unaware of her client's immigration status when she represented him and has no memory of discussing any immigration consequences of his plea, it is highly unlikely that she ever informed him that his guilty pleas carried a substantial risk of deportation. Considering existing professional norms, and the holding in *Padilla*, the defendant has made a sufficient showing that counsel's failure satisfies the first prong of *Saferian*.

To succeed on an ineffective assistance of counsel claim, the

consequence of counsel's serious incompetency must be prejudicial. We have defined prejudice in such claims as "a 'reasonable probability' that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Commonwealth* v. *Mahar*, 442 Mass. 11, 15 (2004), quoting *Strickland, supra* at 694.

In the context of a guilty plea, in order to satisfy the "prejudice" requirement, the defendant has the burden of establishing that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill, supra* at 59. See *Premo* v. *Moore*, 131 S. Ct. 733, 743, 744 (2011). At a minimum, this means that the defendant must aver that to be the case. *Hill, supra* at 60.[17] In addition, he must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla, supra* at 1485. To prove the latter proposition, the defendant bears the substantial burden of showing that (1) he had an "available, substantial ground of defence," *Commonwealth* v. *Saferian, supra* at 96, that would have been pursued if he had been correctly advised of the dire immigration consequences attendant to accepting the plea bargain; (2) there is a reasonable probability that a different plea bargain (absent such consequences) could have been negotiated at the time[18]; or (3) the presence of "special circumstances" that support the conclusion that he placed, or would have placed, particular

---

[17]In *Hill* v. *Lockhart*, 474 U.S. 52 (1985), the petitioner agreed to plead guilty to murder in the first degree (which carried up to fifty years or "life" imprisonment), in exchange for a recommendation of a thirty-five year sentence. *Id.* at 53-54. He subsequently learned that he would not be eligible for parole until he served one-half, rather than one-third, of his sentence because he was a "second offender." *Id.* at 54-55. This was contrary to the advice his counsel had given him at the time of the plea. *Id.* The Court did not reach the issue whether counsel's behavior was constitutionally ineffective because it concluded that the petitioner had not alleged in his habeas petition that, "had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial." *Id.* at 60. Nor had the petitioner "alleged [any] special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty." *Id.*

[18]Prejudice may be shown in some cases by establishing that had the defendant and counsel properly understood and considered the deportation consequences of guilty pleas to some charges, counsel likely would have been able to negotiate a plea to other charges that would not have carried such a

emphasis on immigration consequences in deciding whether to plead guilty. *Hill, supra* at 60.[19] See *Premo* v. *Moore, supra.*

The record in this case suggests that the driving factor in the defendant's decision to plead guilty was the avoidance of the mandatory minimum jail (or prison) sentences that would have attached to the two school zone charges that were subsequently dismissed as part of the plea bargain. The evidence stacked against the defendant left little prospect of escaping those sentences, after which, of course, he would have faced the same deportation consequence that he faces now. Warnings of possible deportation given to him orally by the judge, and in a writing that he signed at the time of the plea, apparently gave him no pause.[20]

---

consequence. Indeed, the Supreme Court in *Padilla* stated that including deportation consequences in the plea bargaining process, "the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties." *Padilla, supra* at 1486. "Counsel who possess the most rudimentary understanding of the deportation consequences of a particular criminal offense may be able to plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood of deportation, as by avoiding a conviction for an offense that automatically triggers the removal consequence." *Id.* No such showing, however, has been made in this case, and speculation alone on that subject is not sufficient. Even if the defendant had established that a plea of guilty to the lesser included offenses of possession of cocaine and marijuana (which are not aggravated felonies under 8 U.S.C. § 1227[a][2][A][iii] [2006 & Supp. III 2009]), would have been reasonably likely in the circumstances, he would have remained subject to deportation under 8 U.S.C. § 1227(a)(2)(B)(i) (2006 & Supp. III 2009).

[19]We are cognizant of the recent decision of the Supreme Court of Washington where it concluded that, in light of the particular severity of the deportation consequences to someone who had earned permanent residency in this country and made it his home, it would be "rational" for a defendant to "take his chances" at trial even though the sentencing differential between the offense to which he pleaded guilty (rape in the third degree, with a range of imprisonment from six to twelve months) and the offense for which he would have stood trial (rape in the second degree with a range of imprisonment from seventy-eight to 102 months) was substantial. *State* v. *Sandoval*, 171 Wash. 2d 163, 175, 176 (2011). Each case will, of course, stand on its own facts. In *Sandoval* (as in *Padilla*), the defendant had been incorrectly advised by his attorney regarding the immigration consequences of his guilty plea. The court, in concluding the defendant had established prejudice, gave heavy weight to the fact that the defendant had been "very concerned" about the risk of deportation at the time he agreed to the plea, and entered the plea because he "trusted [his] attorney to know that he was telling the truth." *Id.* at 175.

[20]The Commonwealth argues that the defendant has not demonstrated

In response, the defendant has not alleged in his affidavit that had he known the deportation consequences of his plea, he would have insisted on going to trial, stating only that he "did not understand at that time of the plea that I could be removed [from] this country for a conviction of intent to distribute the drugs." He also has failed to explain, let alone demonstrate, why, in view of all the considerations at issue at the time of his plea, it would have been rational to plead not guilty and proceed to trial. In his brief, the defendant simply states that his request to withdraw his plea after he received the notice to appear for removal "manifests such actual prejudice," and asks, "Should the first prong be satisfied, the matter may be remanded to the trial court on the second prong . . . ." We decline to do so where the defendant has come nowhere near meeting the burden he bears on the issue of prejudice.

4. *Conclusion.* For the foregoing reasons, although we hold that *Padilla* v. *Kentucky*, 130 S. Ct. 1473 (2010), is to be retroactively applied to convictions obtained on or after April 1, 1997, the defendant here has failed to demonstrate that, but for his counsel's failure to advise him of the immigration consequences of his plea, there is a reasonable probability that the outcome of the proceeding would have been different.

*Order denying motion for a new trial affirmed.*

---

prejudice because the docket sheet shows that the deportation warning was given during the plea colloquy, and the tender of plea form (signed by the judge and the defendant) constitutes further evidence that the defendant was on notice of deportation as a possible consequence at the time he tendered his pleas. While the receipt of such warnings is not an adequate substitute for defense counsel's professional obligation to advise her client of the likelihood of specific and dire immigration consequences that might arise from such a plea, see *Padilla, supra* at 1486 n.15 ("the plea form . . . used in Kentucky courts [also] provides notice of possible immigration consequences"), we agree that it may be relevant to the prejudice prong of *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See *State* v. *Sandoval, supra* at 182 (Johnson, J., concurring) ("warnings are highly relevant to determining whether the client faced prejudice").