COMMONWEALTH vs. KEITH A. WERNER.

No. 07-P-582.

Suffolk. February 8, 2008. - November 5, 2008.

Present: KAFKER, TRAINOR, & SIKORA, JJ.

*Armed Assault in a Dwelling. Search and Seizure. Constitutional Law,* Search
and seizure, Investigatory stop.

Discussion of the standard of review applied to claims that are pursued by a
criminal defendant for the first time in a motion for a new trial. [101]
Discussion of the essential elements of armed assault in a dwelling within
meaning of G. L. c. 265, § 18A. [101-102]
The evidence at a criminal trial permitted a rational jury to identify, beyond a
reasonable doubt, two instances of armed assault in a dwelling in violation
of G. L. c. 265, § 18A. [102-103]
A criminal defendant failed to demonstrate that police officers effectively
seized him without reasonable suspicion, where the visible flashing of the
blue lights of a police cruiser through the windows of the bar in which the
defendant was seated (which action no reasonable person would have
interpreted as restraining every one of the approximately twenty-five
patrons from leaving the bar) did not convert the police officers' exploratory
questioning of the defendant or of the others present at the scene into a
stop. [103-104]

INDICTMENTS found and returned in the Superior Court Depart-
ment on November 7, 1991.

A motion for a new trial, filed on June 23, 2004, was heard
by *Robert A. Mulligan, J.*

*David Keighley* for the defendant.

*Kathleen Celio,* Assistant District Attorney, for the Com-
monwealth.

SIKORA, J. A Superior Court jury convicted the defendant,
Keith A. Werner, of armed assault in a dwelling, see G. L.
c. 265, § 18A; assault by means of a dangerous weapon, see
G. L. c. 265, § 15B(*b*); and unlawful possession of a firearm,

see G. L. c. 269, § 10(a).[1] The defendant filed a notice of appeal, but then moved for its dismissal. A judge of the Superior Court allowed that motion. More than eleven years after his convictions, the defendant challenged them by a motion for a new trial, upon the bases of two alleged errors. As to the first, he contended that the trial judge had wrongly denied his motion for a required finding of not guilty upon the charge of armed assault in a dwelling because the Commonwealth had not established essential elements of that offense: that he was in the victim's dwelling when he held a gun to her head; and that his verbal threats inside the victim's apartment amounted to an assault. The second alleged error was the denial of his pretrial motion to suppress evidence as the product of an unconstitutional stop. In a detailed memorandum of decision, a Superior Court judge addressed each argument and declined to grant relief. This same judge had denied the pretrial motion to suppress and had presided at trial. The appeal warrants careful examination of the elements of armed assault in a dwelling. We affirm the denial of the motion for a new trial.

1. *Factual background.* We address the pertinent events in chronological order. The first account deals with activity at the home of the victim and the sufficiency of the evidence for a verdict of guilt of armed assault in a dwelling. The second deals with the subsequent encounter of the police with the defendant at a barroom and the denial of the pretrial motion to suppress a handgun and a piece of paper seized by the police in the encounter.

a. *Events at the dwelling.* In the light most favorable to the Commonwealth, the evidence was the following. On September 7, 1991, at about 10:00 P.M., the fifteen year old victim was in her family's apartment on the first floor of a three-family house in Chelsea. A common, outside porch had an entrance leading

---

[1] At the close of the Commonwealth's case, the trial judge entered findings of not guilty on one of the charges of unlawful possession of a firearm and on the charge of unlawful transfer of a firearm. Upon the conviction of armed assault in a dwelling, the judge sentenced the defendant to a term of fifteen to twenty years in State prison. Upon the conviction of assault by means of a dangerous weapon, the judge sentenced the defendant to four to five years, concurrent with the sentence for armed assault in a dwelling. And upon the conviction of unlawful possession of a firearm, the judge sentenced the defendant to a term of four to five years, from and after the sentence for armed assault in a dwelling.

to the apartments upstairs. Next to that entrance was a separate entry, with a storm door and a screen door, to the victim's apartment. The storm door was open. The screen door was closed, but its upper panel did not have a screen.

The victim was home alone with her four month old sister. Her father and her stepmother had gone to a hospital to visit her brother. She heard a knock on the front door. She approached the door and saw the defendant standing on the porch. She never had seen him before. He asked for her father, and she replied that he was not home; then she turned away. The defendant opened the screen door. The victim asked him twice to leave. He nevertheless entered and followed her into the living room. Standing a couple of inches from her, he told her that the residents of the third floor had sent him to "straighten out [her] father" who owed them money and that her father needed to "smarten up." He ordered her to place her sister, whom the victim was holding, in a different room. She refused. Next, the defendant said that he was going to kill everyone in her house and that "it was just another brick in the wall." He then told her that he knew all members of her family and where they slept. She again asked him to leave.

The defendant then said that he was going to see the people on the third floor and went out onto the porch. The victim followed and stopped at the doorway, without stepping onto the porch. The storm door still was open. The defendant took a gun from his waistband, held it so that it touched her nose, and said that he would kill her sister and her.

The defendant then went upstairs but returned shortly afterward with Debbie Wilson and Chuck Hummel, the third-floor residents. Wilson's incarcerated son had sent the defendant to enforce payment of the alleged debt. The victim began to cry and asked Wilson to settle the dispute directly with her father. Wilson replied, "No." Next, the defendant handed Hummel a bag. Hummel took a gun out of the bag and the defendant loaded it with two bullets. Hummel then took the gun and went back upstairs with Wilson; the defendant left, and the victim called the police.

b. *Events at the barroom.* The findings of the judge and the undisputed supplemental testimony inferably credited by him

from the pretrial suppression hearing established the following. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007). The police arrived at the victim's apartment at approximately 11:00 P.M. The victim reported that a man had forced his way into her home, pulled out a gun, held it to her head, and threatened to kill the members of her family and her. She described the suspect as a thirty-five year old white male with short blond hair and medium build, clean shaven, and dressed in black or blue jeans and a blue dungaree jacket. From the scene, Officer John Cowhig transmitted this description over the radio to the station house. The police left the victim's residence at approximately 11:30 P.M. When Officer Cowhig's shift ended at midnight, he repeated the victim's account, including the description of the defendant, to the police officers arriving for the next shift. At this time, the police did not know the defendant's whereabouts.

At about 12:15 A.M., Chelsea police received a call that a man in a local bar, the Chelsea Tap, had a firearm. Police Officers Martin Conley and Ethan Gonzales responded. They pulled up to the Chelsea Tap in a marked cruiser with its blue lights flashing. They were in uniform. The defendant inside the bar observed the blue lights outside. Still outside, the police officers encountered a taxicab driver who informed them that a man inside the bar with blond hair and a dungaree jacket had a gun. The officers' supervisor, Sergeant Karen McDonough, arrived, and the three entered the barroom. It contained about twenty-five patrons.

Officer Conley saw one patron point to a man with blond hair and a dungaree jacket seated at the bar. As Conley approached the suspect from behind, the bartender made eye contact with the officer and nodded affirmatively. He had shaken his head "no" toward at least one other patron. The suspect was the defendant. He was sitting on a stool with his hands in front of him on the bar.

Officer Conley asked the defendant, "Are you carrying a firearm, sir?" The defendant reached for his waist with both hands. Because Conley saw that the defendant "was grabbing for something," Conley "tilted him back in his bar stool . . . to throw him off balance." In the process, the officer felt a gun in the back of the waistband of the defendant's jeans. Conley extracted the gun, a .38 caliber revolver. He asked the defendant

his name and inquired whether he had a license to carry a firearm. The defendant did not respond. The police arrested and transported him to the police station. Afterward, the bartender turned over to the police a piece of yellow, lined paper which he had found at the defendant's bar space.

2. *Discussion.* a. *Standard of review.* Issues not pursued on direct appeal are waived. *Commonwealth* v. *Curtis,* 417 Mass. 619, 626 (1994), citing *Commonwealth* v. *Grace,* 376 Mass. 499, 500 (1978), and *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 229 (1973). We review them nonetheless to determine whether any error created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Curtis, supra* at 631. This standard of review applies equally to waived constitutional claims. *Commonwealth* v. *Amirault,* 424 Mass. 618, 641 (1997). "[A] separate exception for constitutional matters 'would . . . likely . . . swallow the rule, because many, if not a majority, of the errors alleged to have occurred at trial currently are argued on appeal as deprivations of constitutional right.' " *Ibid.,* quoting from *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. 10, 18-19 (1986).

b. *Sufficiency of the evidence of armed assault in a dwelling.* The judge inquired under the standard of *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The defendant argues that his threats inside the apartment did not amount to an assault because they did not cause the victim reasonable apprehension of immediate bodily harm; and because his pointing of the gun at the victim occurred on the porch, outside the dwelling. The parties agree that the doorway from the porch into the victim's apartment marked the boundary of the dwelling.

The essential elements of armed assault in a dwelling within the meaning of G. L. c. 265, § 18A, are "(1) entry of a dwelling while armed[;] (2) an assault on someone in the dwelling; and (3) a specific intent, accompanying the assault, to commit a felony." *Commonwealth* v. *Donoghue,* 23 Mass. App. Ct. 103, 111-112 (1986), cert. denied, 481 U.S. 1022 (1987). An "entry" within the contemplation of G. L. c. 265, § 18A, consists of the intrusion of "any part of a defendant's body" into the dwelling.

*Commonwealth* v. *Stokes*, 440 Mass. 741, 748 (2004), quoting from *Commonwealth* v. *Burke*, 392 Mass. 688, 690 (1984) (the latter discussing the entry requirement in G. L. c. 265, § 18C, and in related statutes). Thus, a defendant enters a dwelling if a part of his arm crosses the plane of the doorway into the dwelling. *Id.* at 748-749.

"[A]n assault is defined as either an attempt to use physical force on another, or as a threat of use of physical force." *Commonwealth* v. *Gorassi*, 432 Mass. 244, 248 (2000), citing *Commonwealth* v. *Shaffer*, 367 Mass. 508, 515 (1975). The latter requires a showing that "the defendant engaged in 'objectively menacing' conduct with the intent to put the victim in fear [or apprehension] of immediate bodily harm." *Commonwealth* v. *Gorassi*, *supra* at 248, quoting from *Commonwealth* v. *Musgrave*, 38 Mass. App. Ct. 519, 524 n.7 (1995), *S.C.*, 421 Mass. 610 (1996). Accord *Commonwealth* v. *Delgado*, 367 Mass. 432, 437 (1975) (using the term "apprehension"); *Ginsberg* v. *Blacker*, 67 Mass. App. Ct. 139, 143 (2006) (same). The victim's apprehension of imminent physical harm must be reasonable. *Commonwealth* v. *Gordon*, 407 Mass. 340, 349 (1990). The determination of the reasonableness of the apprehension requires assessment of "the actions and words of the defendant in light of the attendant circumstances." *Ibid.*, citing *Commonwealth* v. *Delgado*, *supra* at 436-437. A victim's apprehension of harm in "an attempted battery type of assault," on the other hand, is immaterial. *Commonwealth* v. *Gorassi*, *supra.*

Finally, G. L. c. 265, § 18A, does not require the use of a weapon in perpetration of the assault; an entry while armed satisfies the first element of the statute. See *Commonwealth* v. *Hawkins*, 21 Mass. App. Ct. 766, 768 & n.4 (1986) (statute "require[s] that the perpetrator be armed with a dangerous weapon but not that it be *used*"); *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58, 61-62 (1997) (discussing G. L. c. 265, § 18C, in same context).

In this case, a rational jury could identify, beyond a reasonable doubt, two instances of armed assault in a dwelling in violation of G. L. c. 265, § 18A. In the first instance, the defendant came into the victim's apartment against her pleas and, standing a few inches from her, threatened to kill everyone in

her household. He possessed a firearm. He explained that he was there as the result of her father's debt to the upstairs tenants; that he knew the activities and sleeping places of all members of her household; and that this killing would be "just another brick in the wall," an intimidating suggestion of prior violence against other victims.

The timing, as well as the youth and the isolation of the victim, would cause reasonable apprehension. She was an adolescent in charge of an infant, alone at night. The defendant presented himself as the representative of two additional adults living on the third floor of the house. These circumstances permitted a rational jury to find that the defendant's threats placed her in reasonable fear of immediate bodily harm.

Separately, the jury could find that the defendant's arm or hand crossed into the dwelling as he stood on the porch and touched the victim's face with the handgun as she stood just inside the screen door. An entry may arise even if "only an instrument used to commit the intended felony crosses the threshold" of a dwelling. *Commonwealth* v. *Stokes*, 440 Mass. at 749 n.9, citing with approval *Commonwealth* v. *Cotto*, 52 Mass. App. Ct. 225, 229 (2001) (the latter stating that "an entry occurs when any part of the defendant's body, or an instrument which is used to commit the intended felony, crosses the threshold").

The third element of armed assault in a dwelling is the specific intent to commit a further felony. Here the indictment identified the felony as "threats to extort." That reference would include the offense of attempted extortion as defined by G. L. c. 265, § 25, as appearing in St. 1953, c. 294: "Whoever, verbally . . . maliciously threatens an injury to the person or property of another . . . with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished." The evidence showed the intent of the defendant to threaten harm to the victim and her family as a means to compel payment of an alleged debt. It fulfilled the final element. .

c. *Suppression of the barroom items.* The defendant argues that the police effectively seized him, i.e., stopped him, without reasonable suspicion *before* he reached for his waist because the blue lights of the police cruiser were visibly flashing at him

through the windows and because Officer Conley had narrowed his focus and questioning to him.

"[T]he police do not effect a seizure merely by asking questions unless the circumstances of the encounter are sufficiently intimidating that a reasonable person would believe he was not free to turn his back on his interrogator and walk away." *Commonwealth* v. *Fraser*, 410 Mass. 541, 544 (1991). Activation of blue lights or sirens while the police pursue or focus attention on a suspect tell him that he is not free to leave. See *Commonwealth* v. *Smigliano*, 427 Mass. 490, 491-492 (1998) (cruiser pulling up behind defendant's vehicle and activating blue lights was stop); *Commonwealth* v. *Campbell*, 69 Mass. App. Ct. 212, 215 (2007) (maneuvers of two police cruisers with activated blue lights alongside and behind defendant's car were stop). In contrast, "the initial appearance of a cruiser with lights and sirens already activated does not necessarily send a message to stop" to any particular person on the scene. *Ibid.* See *Commonwealth* v. *Evans*, 436 Mass. 369, 373-374 (2002) (activating blue lights in performance of community caretaking function was not signal to stop).

No sufficiently confining or intimidating circumstances were present here. The police officers did not direct or control the defendant, block his path, or employ force. See *Commonwealth* v. *Nestor N.*, 67 Mass. App. Ct. 225, 228-229 (2006). See also *Commonwealth* v. *Fraser, supra* at 543 (police officer who approaches suspect, identifies himself as police officer, and requests suspect take his hands out of his pocket does not accomplish seizure); *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996) (pulling up in an unmarked cruiser and asking the defendant to "hold up a minute" is not a stop). The police had activated the blue lights before they arrived at the Chelsea Tap. No reasonable person would have interpreted the flashing blue lights outside the bar as restraining every one of the approximately twenty-five patrons from leaving the bar. The blue lights did not convert the police officers' exploratory questioning of the defendant or of the others present at the scene into a stop.[2] The judge correctly rejected the suppression argument.

---

[2] The defendant acknowledges that his seizure *after* the reach toward his waist was justified.

3. *Conclusion.* For these reasons we affirm the order denying the defendant's motion for a new trial.

*So ordered.*