NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11792

COMMONWEALTH  vs.  PAVEL LAVRINENKO.


Hampden.     April 7, 2015. - October 5, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Alien.  Constitutional Law, Plea, Assistance of counsel.  Due
     Process of Law, Plea, Assistance of counsel.  Practice,
     Criminal, Plea, Assistance of counsel.



     Complaint received and sworn to in the Springfield Division
of the District Court Department on April 11, 2005.

     A motion to withdraw a plea of guilty, filed on December 3,
2013, was heard by John M. Payne, Jr., J.; a motion for
reconsideration was also heard by him, and a second motion for
reconsideration was considered by him.

     The Supreme Judicial Court granted an application for
direct appellate review.

     Merritt Schnipper for the defendant.
     Cynthia Cullen Payne, Assistant District Attorney (Jane
Davidson Montori, Assistant District Attorney, with her) for the
Commonwealth.
     Wendy S. Wayne & Jennifer Klein, Committee for Public
Counsel Services, & Laura Murray-Tjan, for Committee for Public
Counsel Services, amicus curiae, submitted a brief.

GANTS, C.J.  The issue on appeal is whether a noncitizen defendant, admitted into the United States as a refugee, is entitled to withdraw his guilty plea to a complaint charging assault by means of a dangerous weapon, where his attorney did not make a reasonable inquiry regarding the defendant's citizenship, and therefore did not learn that he was a refugee. We conclude that, under art. 12 of the Massachusetts Declaration of Rights, constitutionally effective representation of a criminal defendant requires defense counsel to make a reasonable inquiry of the defendant to determine whether he or she is a citizen of the United States and, if the defendant is not, to make a reasonable inquiry into the defendant's immigration status, including whether the defendant was admitted into this country as a refugee or has been granted asylum.

We also conclude that, in determining whether a defendant suffered prejudice from counsel's deficient performance, "special circumstances" regarding immigration consequences, as contemplated in Commonwealth v. Clarke, 460 Mass. 30, 47-48 (2011), should be given substantial weight in determining, based on the totality of the circumstances, whether there is a reasonable probability that the defendant would have rejected the plea offer and insisted on going to trial had counsel provided competent advice regarding the immigration consequences of the guilty plea.  Moreover, a defendant's status as a refugee

or an asylee is a special circumstance entitled to particularly substantial weight. Because the motion judge found that counsel's performance was deficient but did not consider the defendant's refugee status in finding that the defendant suffered no prejudice, we vacate the denial of the motion for a new trial and the motions for reconsideration, and remand the matter to the District Court for further proceedings consistent with this opinion.[1]

Background. The following facts are drawn from the motion judge's findings of fact, supplemented with details from the record where they are consistent with the judge's findings. The defendant was born in Novokuznetsk, Russia, and came to the United States with his parents and two siblings in 2000 at the age of thirteen. They had left Russia to escape religious persecution as Pentecostal Christians, and were admitted into the United States as refugees.

On April 10, 2005, when the defendant was seventeen years old, he operated a motor vehicle while intoxicated and crashed into a streetlamp post. The defendant drove away, but police officers observed the defendant's vehicle with heavy damage and began following him in a marked police cruiser to perform a

---

[1] We acknowledge the amicus brief submitted by the Immigration Impact Unit of the Committee for Public Counsel Services (CPCS).

motor vehicle stop. With the officers in pursuit, the defendant's vehicle sped away but eventually struck a tree; the defendant got out of the vehicle, ran, and jumped into a nearby river. After the police officers arrived at the river bank, the defendant began moving back toward shore. According to the police report, the officers observed the defendant holding a "stick" as he approached them, and one of the officers ordered the defendant to drop the stick several times. The defendant continued to hold the stick "in a threatening manner" until an officer used pepper spray on the defendant, and he dropped the stick into the water and came on shore, where he was arrested.[2]

A complaint issued on April 11, 2005, charging the defendant in the Springfield Division of the District Court Department (Springfield District Court) with seven counts, including driving while under the influence of alcohol, leaving the scene of property damage, and assault by means of a dangerous weapon (the stick).[3] In addition, as a result of the

---

[2] According to the defendant's affidavit, he held onto a floating branch to steady himself in the strong river current, as he was standing in cold water on a soft river bottom. He could not hear anything that the officer said but used the branch for balance as he moved toward the river bank. The defendant attests that he never intended to hit or threaten a police officer with the branch.

[3] The defendant was also charged with failure to stop for police, speeding, a motor vehicle equipment violation, and a marked lanes violation.

defendant's conduct on April 10, the defendant was charged with violating the conditions of probation that he was serving on a continuance without a finding for knowingly receiving stolen property. At the time, he also had pending charges in Springfield District Court of malicious destruction of property and attempt to commit a crime. As part of what the judge described as a "global resolution" of all outstanding cases, the defendant pleaded guilty on April 28 to the earlier charges of malicious destruction of property and attempt, and was sentenced to ninety days in a house of correction, to be served concurrently. On April 29, he pleaded guilty to driving while under the influence of alcohol, leaving the scene of property damage, and assault by means of a dangerous weapon; he also admitted to the probation violation, and a guilty finding was entered on the charge of knowingly receiving stolen property.[4] He was sentenced on these charges to a total of ninety days in a house of correction, with the sentences to be served concurrently with each other and with the sentences imposed on April 28.

---

[4] The defendant also pleaded guilty to failing to stop for police, and pleaded "responsible" for the motor vehicle equipment violation, speeding, and the marked lanes violation; all four charges were placed on file with the defendant's consent.

On October 31, 2012, the defendant was detained by United States Immigration and Customs Enforcement and subsequently placed in removal proceedings.  An immigration judge granted the defendant's application for adjustment of status to lawful permanent resident, but the United States Department of Homeland Security appealed the decision, and the board of immigration appeals remanded the case for further proceedings to determine whether the defendant is a "violent or dangerous" individual.

On December 3, 2013, the defendant filed a motion to withdraw his guilty plea to the charge of assault by means of a dangerous weapon.  The judge who had accepted the defendant's guilty plea in 2005 conducted a nonevidentiary hearing, and denied the motion.  After the defendant filed a motion for reconsideration, the judge held an evidentiary hearing during which the defendant, the defendant's criminal defense attorney at the time of his guilty plea (plea counsel), and the defendant's immigration counsel testified.

Although plea counsel could not remember whether he advised the defendant about immigration consequences, he explained that, as a matter of course, he gave a standard warning to all of his clients that essentially repeated the same warnings included in the "green sheet," that is, the District Court Department's

preprinted "Tender of Plea or Admission Waiver of Rights" form.[5]

That form, which the defendant signed on the day of his guilty

plea, included the following statement:  "I understand that if I

am not a citizen of the United States, conviction of this

offense may have the consequences of deportation, exclusion from

admission to the United States, or denial of naturalization,

pursuant to the laws of the United States."[6]  Plea counsel

testified that he typically prefaced the discussion of

immigration consequences with a client by stating that he did

not know the client's immigration status and "it wasn't really

[his] concern."  He would then tell the client that he did not

know whether the client had "any immigration concerns at all,"

---

[5] In his affidavit, the defendant's criminal defense
attorney at the time of the defendant's guilty plea (plea
counsel) stated, "I have no specific recollection of discussing
potential immigration consequences of a guilty plea with [the
defendant], but it was at that time and has always been my
practice to advise all criminal defense clients that if they
were not United States citizens, deportation was a risk as a
result of a criminal conviction."

[6] This statement in the defendant's waiver of rights form
mirrors the warning that a judge is required by statute to
provide a defendant during the plea colloquy.  See G. L. c. 278,
§ 29D ("The court shall not accept a plea of guilty . . . from
any defendant in any criminal proceeding unless the court
advises such defendant of the following:  'If you are not a
citizen of the United States, you are hereby advised that the
acceptance by this court of your plea of guilty . . . may have
consequences of deportation, exclusion from admission to the
United States, or denial of naturalization, pursuant to the laws
of the United States'").

but would add, "[I]f you're convicted of any offense . . . you could be deported or excluded."[7]

Plea counsel further testified that, unless "there was some red flag" or an issue that the client brought to his attention, he would give this standard advice regardless of the particular charges in the case.  He noted that, if the client "brought something to [his] attention and [he] thought that it might be . . . in [the client's] best interests to do some further research, [he has] done that over the years."  However, he was not aware at the time of the defendant's plea of any immigration law issues specific to refugees and did not "remember ever having a discussion with any client regarding refugee status."

The judge acknowledged that he possessed "no independent memory of this defendant or the events surrounding the plea," and found that neither the defendant nor plea counsel had significant memory of any discussions regarding immigration issues.  Thus, it was unclear "what if any immigration warnings were discussed between the defendant and [plea counsel]."  The judge found that "it is clear that the issue of the defendant's

---

[7] The defendant testified that he did not tell plea counsel about his immigration status and did not receive advice about immigration consequences.  The defendant did not remember whether plea counsel asked him about his immigration status.

refugee status was not addressed," and for that reason, counsel's performance was deficient.[8]

The judge, however, concluded that the defendant was not prejudiced by the attorney's deficient performance because the plea served as a "global resolution . . . offering a [lesser] total period of incarceration." Considering that the defendant "was facing the possibility of jail time possibly upwards of [two and one-half years]" in a house of correction, the judge found that "[t]here is every reason to believe that [the defendant] was more than satisfied with the result at that time and would have had little if any leeway in successfully defending" the charges arising from the April 10, 2005, incident to which he pleaded guilty. The judge denied the defendant's motion for reconsideration and then denied a second motion for reconsideration. The defendant appealed, and we granted his motion for direct appellate review.

---

[8] In his affidavit, plea counsel stated, "I have no specific recollection of being aware of [the defendant's] refugee status when I represented him on these charges, or of addressing any refugee status-specific issues when I discussed the pros and cons of a potential guilty plea with him. Refugee status-specific advice was not part of the standard immigration consequences discussion I would have with my criminal defense clients." Furthermore, he stated, "I can affirmatively state that I did not advise [the defendant] about the potential impact of a guilty plea to the charge of assault with a dangerous weapon on his eligibility for asylum in the United States."

*Discussion.* 1. *Standard of review.* "A motion to withdraw a guilty plea is treated as a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001)." Commonwealth v. DeJesus, 468 Mass. 174, 178 (2014), citing Commonwealth v. Furr, 454 Mass. 101, 106 (2009). We "examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." Commonwealth v. Grace, 397 Mass. 303, 307 (1986). In doing so, "[w]e accept the judge's findings of fact if supported by the evidence, because the judge who heard the witnesses testify is the 'final arbiter on matters of credibility.'" DeJesus, supra, quoting Commonwealth v. Scott, 467 Mass. 336, 344 (2014).

2. *Refugee status.* Before turning to whether counsel's performance was constitutionally deficient, we discuss the defendant's refugee status and the immigration consequences at issue in this case. Under Federal law, a noncitizen who is outside the United States may be admitted into the United States in the discretion of the United States Attorney General if granted refugee status. See 8 U.S.C. § 1157(c) (2012) (subject to limitations on number of refugees able to be admitted per year, United States Attorney General may in his or her discretion "admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian

concern to the United States, and is admissible").[9]  To be admitted as a refugee, a noncitizen must meet the definition of "refugee," as defined in the Immigration and Nationality Act (act), that is, a person "who is unable or unwilling to return to . . . [the person's country of origin] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[10]  8 U.S.C. § 1101(a)(42) (2012).

Although not defined in either the act or the immigration regulations, "persecution" generally means abuse that has "reached a fairly high threshold of seriousness, as well as some regularity and frequency."  Ivanov v. Holder, 736 F.3d 5, 11 (1st Cir. 2013), quoting Rebenko v. Holder, 693 F.3d 87, 92 (1st Cir. 2012).  See Barsoum v. Holder, 617 F.3d 73, 79 (1st Cir.

_____

[9] Under a related provision of the Immigration and Nationality Act (act), a noncitizen who is present in the United States may seek asylum to remain in the United States.  See 8 U.S.C. § 1158 (2012) ("Any alien who is physically present in the United States or who arrives in the United States . . . , irrespective of such alien's status, may apply for asylum").

[10] The definition of "refugee" applies both to persons outside of the United States seeking refugee status and to persons inside the United States seeking asylum.  See 8 U.S.C. § 1158(b)(1)(A) (Secretary of Homeland Security or United States Attorney General may grant asylum to noncitizen who has properly applied if either "determines that such alien is a refugee within the meaning of [the act]").  Here, the defendant had been granted refugee status, but because persons granted asylum must meet the definition of "refugee," the holding of this opinion also applies to persons granted asylum.

2010) ("The 'severity, duration, and frequency of physical abuse' are factors relevant to this determination, . . . as is whether harm is 'systematic rather than reflective of a series of isolated incidents'" [citations omitted]).  The person seeking refugee status "must also demonstrate that the persecution he [or she] experienced occurred 'on account of' a statutorily-protected ground," that is, race, religion, nationality, membership in a particular social group, or political opinion.  Ivanov, supra at 12, quoting Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007).

Here, the defendant was admitted into the United States with his family as a refugee, and his refugee status had not been terminated at the time of the plea.[11]  Although he could not remember in great detail how Pentecostal Christians had been treated in Russia at the time he was granted refugee status, he testified that he remembered churches were closing and his family was not allowed to pray.  At the nonevidentiary hearing on the motion for a new trial, the defendant provided the judge with a summary of various governmental and nongovernmental entity reports, United States congressional resolutions, and news articles on the conditions in Russia relevant to

---

[11] It is unclear from the record whether the defendant's refugee status was derivative of a parent's refugee status.  See 8 U.S.C. § 1157(c)(2)(A) (2012); 8 C.F.R. § 207.7 (2011).

Pentecostal Christians.  At the subsequent evidentiary hearing, the defendant's immigration attorney testified to the information he learned about the conditions in Russia through reading these submissions.  He stated that from the decade of the 1990s through at least 2005, there had been violence brought directly against Pentecostal Christians and their places of worship, with a rise in church burnings between 2005 and 2006 that resulted in hearings by the United States Helsinki Commission.[12]

3.  <u>Discretionary immigration relief</u>.  One year after a refugee is admitted into the United States, he or she may be eligible to adjust his or her status to be regarded as "lawfully admitted to the United States for permanent residence," and receive what is commonly known as a "green card."  8 U.S.C. § 1159(a) (2012).  To adjust one's status from refugee to lawful permanent resident, a refugee must satisfy the admissibility

---

[12] At the evidentiary hearing, the judge allowed the defendant's immigration attorney to testify about the summary of country conditions de bene, and no motion to strike this testimony was presented.  See Mass. G. Evid. § 104(b) (2015) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.  The court may admit the proposed evidence, de bene, on the condition that the proof be introduced later.  Evidence so admitted is subject to a motion to strike if that proof is not forthcoming").  The judge did not refer to the conditions in Russia for Pentecostal Christians in his findings and order.

requirements of 8 U.S.C. § 1182 (2012). A noncitizen who has committed two or more crimes "involving moral turpitude" is inadmissible under § 1182(a)(2), and is deportable. See 8 U.S.C. § 1227(a)(2)(A)(ii) (2012) ("Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable"). The defendant in his immigration appeal did not challenge the immigration judge's determination that he is inadmissible and deportable because he committed two crimes involving moral turpitude, specifically malicious destruction of property and knowingly receiving stolen property.

However, even where, as here, a refugee is inadmissible and deportable, the refugee may still seek an adjustment of status from refugee to lawful permanent resident by applying for a waiver of inadmissibility. See 8 U.S.C. § 1159(c) (2012). A waiver of inadmissibility may be granted in the discretion of the United States Attorney General or the Secretary of Homeland Security "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." Id. Where a refugee in removal proceedings obtains a waiver of inadmissibility and adjusts his or her status from refugee to lawful permanent resident, removal proceedings are terminated.

See Matter of Rainford, 201 I. & N. Dec. 598, 602 (B.I.A. 1992) ("the conviction which renders the respondent deportable . . . will not preclude a showing of admissibility . . . , and . . . if granted adjustment of status to lawful permanent resident, the respondent will no longer be deportable on the basis of this prior conviction").  See also Drax v. Reno, 338 F.3d 98, 113 (2d Cir. 2003); United States v. Gonzalez-Roque, 301 F.3d 39, 42 n.1 (2d Cir. 2002).  See generally R.D. Steel, Steel on Immigration Law § 14:27, 586-588 (2014) ("Adjustment of status is a complete remedy, since the [applicant] becomes a permanent resident and the removal proceedings are terminated").

The United States Attorney General in 2002 published an opinion that limited the availability of a discretionary waiver of inadmissibility regarding refugees who are "violent or dangerous individuals."  In re Jean, 23 I. & N. Dec. 373, 383 (A.G. 2002).  The Attorney General declared that it would not be "a prudent exercise" of this discretion "to grant favorable adjustments of status to violent or dangerous individuals except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship." Id.  The Attorney General added that, "depending on the gravity of the alien's underlying criminal offense, such a showing might

still be insufficient." Id. Under this opinion, refugees who commit violent or dangerous crimes are not automatically barred from obtaining a waiver, see Jean v. Gonzales, 452 F.3d 392, 397 (5th Cir. 2006), but their waiver request is subject to a "heightened standard." Ali v. Achim, 468 F.3d 462, 466-467 (7th Cir. 2006).

Here, the defendant argues that as a result of his guilty plea to the charge of assault by means of a dangerous weapon, he was subject to the heightened standard under In re Jean. Because there are no facts showing any likelihood that the defendant could meet the heightened standard, he claims that his chances of receiving a waiver of inadmissibility and an adjustment of status were extinguished by this guilty plea.

4. Ineffective assistance of counsel. The defendant argues that his plea counsel provided ineffective assistance of counsel by failing to adequately inform him of the immigration consequences of pleading guilty to the charge of assault by means of a dangerous weapon, and that his plea to that offense should be vacated and a new trial ordered.[13] To prevail, the

---

[13] Alternatively, the defendant argues that if this court does not grant his motion for a new trial, the case should be remanded to the District Court for reconsideration, with substantial weight given to his refugee status in determining whether he should prevail on the claim of ineffective assistance of counsel.

defendant bears the burden of showing that his attorney's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," and that he suffered prejudice because of his attorney's unprofessional errors. Commonwealth v. Clarke, 460 Mass. 30, 45 (2011), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

a. Deficient performance. In determining the level of performance required of an ordinary fallible lawyer, we look to the "professional standards of the legal community." Clarke, supra at 45. See Padilla v. Kentucky, 559 U.S. 356, 366 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable'" [citation omitted]). "The weight of prevailing professional norms supports the view that counsel must advise [his or] her client regarding the risk of deportation." Id. at 367. See Commonwealth v. Sylvain, 466 Mass. 422, 436 (2013) ("under art. 12 [of the Massachusetts Declaration of Rights] defense counsel must accurately advise a noncitizen client of the deportation consequences of a guilty plea or a conviction at trial").

Just as the ordinary physician must take a history from the patient before rendering a diagnosis, so, too, must the ordinary criminal defense attorney make a reasonable inquiry of his or her client regarding the client's history, including whether he

or she is a citizen of the United States.  See Clarke, 460 Mass. at 45-46, citing National Legal Aid and Defender Ass'n, Performance Guidelines for Criminal Representation § 2.2(b)(2) (1995), and General Policies Applicable to all Assigned Counsel, CPCS Performance Standards Governing Representation of Indigents in Criminal Cases, §§ 2.2, 4.1, 5.4(o) (rev. 2004) ("National and Massachusetts performance guidelines require criminal defense counsel to interview a defendant and gather significant personal information in order to represent him").  Unless a criminal defense attorney knows whether a defendant is a United States citizen, the attorney cannot properly evaluate the likelihood that the defendant will face immigration consequences, investigate potential avenues of relief, minimize such consequences through plea negotiations, or understand how highly the defendant values staying in the United States.  See Clarke, supra at 46 ("That the defendant's counsel failed to ascertain that the defendant was not a United States citizen may be sufficient to satisfy the first prong of the Saferian standard because effective representation requires counsel to gather at least enough personal information to represent him").

Where a criminal defense attorney learns that his or her client is a noncitizen, the attorney must make further reasonable inquiry of the client to determine, where possible, the client's immigration status.  See L. Rosenberg, D.

Kanstroom, & J.J. Smith, Immigration Consequences of Criminal Proceedings 2-3 (2011) ("The first specific problem facing the criminal law practitioner who encounters a noncitizen in criminal proceedings is to determine as accurately as possible the person's exact legal status under the immigration laws of the United States"); American Bar Association Criminal Justice Standards for the Defense Function, Standard 4-5.5 (4th ed. 2015) (pending publication) ("Defense counsel should determine a client's citizenship and immigration status, assuring the client that such information is important for effective legal representation and that it should be protected by the attorney-client privilege").  See also D. Kesselbrenner & L. Rosenberg, Immigration Law & Crimes § 1:4, at 5 (2015) ("Within th[e] comprehensive category [of noncitizens], an individual noncitizen has a more specific immigration status, which is a relevant factor to the practitioner representing him or her in either the criminal or immigration arena, or in both").[14]

---

[14] We recognize that there may be some circumstances in which a reasonable inquiry of the client may not reveal the client's citizenship or, more likely, the client's immigration status, especially where the client has little formal education or has intellectual, developmental, or mental health challenges. See Padilla v. Kentucky, 559 U.S. 356, 379-380 & n.1 (2010) (Alito, J., concurring in the judgment) ("it may be hard, in some cases, for defense counsel even to determine whether a client is an alien").  In these circumstances, a reasonable inquiry may need to include an inquiry of family members of the client regarding these matters.

Without making a reasonable inquiry of the client's immigration status, defense counsel is not in an adequate position to determine what advice is "available." Clarke, 460 Mass. at 46, quoting Padilla, 559 U.S. at 371 ("[i]t is quintessentially the duty of counsel to provide [his or] her client with available advice about an issue like deportation"). See Benach, Zota, & Navarro, American Bar Association, Section of Litigation, How Much to Advise: What Are the Requirements of Padilla v. Kentucky (2013) (practice advisory on Padilla stating that "[a] correct analysis of the actual immigration consequences of a plea depends upon numerous factors," including "immigration status," because undocumented defendant may be affected differently from lawful permanent resident). Therefore, the failure of a criminal defense attorney to make a reasonable inquiry of the client regarding his or her citizenship and immigration status is sufficient to satisfy the deficient performance prong of the ineffective assistance analysis. See Clarke, supra. See also State v. Paredez, 136 N.M. 533, 539 (2004) ("We hold that criminal defense attorneys are obligated to determine the immigration status of their clients. If a client is a non-citizen, the attorney must advise that client of the specific immigration consequences of pleading guilty, including whether deportation would be virtually certain").

It is especially important that a criminal defense attorney learn whether his or her client was admitted into this country as a refugee. "[D]eportation is an integral part -- indeed, sometimes the most important part -- of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." Padilla, 559 U.S. at 364. Where the client was admitted into this country as a refugee, the consequence of deportation might be especially severe, because the client obtained such status only after the immigration authorities determined that he or she faced persecution on account of race, religion, nationality, membership in a particular social group, or political opinion in his or her country of origin. Because that persecution may result in many forms of harm or suffering, including potentially death or serious injury, the avoidance of deportation may be of immense importance to a refugee. See id. at 370 n.11 ("were a defendant's lawyer to know that a particular offense would result in the client's deportation and that, upon deportation, the client and his [or her] family might well be killed due to circumstances in the client's home country, any decent attorney would inform the client of the consequences of his [or her] plea").

Here, although plea counsel had little memory of his representation of the defendant, he admits that in 2005 it was not his usual practice to ask clients facing criminal charges

whether they were noncitizens, and that his usual practice was simply to give all of his clients a standard warning on immigration consequences. It is not sufficient for a criminal defense attorney, as a matter of practice, merely to give the same warning that the defendant will receive from the judge during the plea colloquy required by G. L. c. 278, § 29D. See Clarke, 460 Mass. at 48 n.20 ("[T]he receipt of such warnings is not an adequate substitute for defense counsel's professional obligation to advise [his or] her client of the likelihood of specific and dire immigration consequences that might arise from such a plea"). See also DeJesus, 468 Mass. at 177 n.3.

The motion judge also found that the defendant's refugee status was not "addressed." Plea counsel had no recollection of being aware of the defendant's refugee status; he testified that refugee status would have been a "red flag" that, at a minimum, would have caused him to conduct further research. Because plea counsel failed to make a reasonable inquiry of the defendant to learn of this "red flag," counsel failed to learn what he needed to know to advise his client competently regarding the immigration consequences of a guilty plea. See Strickland v. Washington, 466 U.S. 668, 691 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Cf. Commonwealth v. Lang, 473 Mass. , (2015) (Hines, J.,

concurring) (defense counsel's performance is deficient where he or she is aware of information that may call into question defendant's criminal responsibility but declines to investigate or otherwise consider defendant's mental condition).[15]

b. <u>Prejudice</u>. "In the context of a guilty plea, in order to satisfy the 'prejudice' requirement, the defendant has the burden of establishing that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" <u>Clarke</u>, 460 Mass.

_____

[15] We recognize that the ordinary, fallible criminal defense attorney may not be an expert on immigration law, but we expect such an attorney who learns of a complex immigration issue either to research the applicable immigration law or to seek guidance from an attorney knowledgeable in immigration law.  See American Bar Association Criminal Justice Standards for the Defense Function, Standard 4-5.5 (4th ed. 2015) (pending publication) ("If defense counsel determines that a client may not be a United States citizen, counsel should investigate and identify particular immigration consequences that might follow possible criminal dispositions.  Consultation or association with an immigration law expert or knowledgeable advocate is advisable in these circumstances.  Public and appointed defenders should develop, or seek funding for, such immigration expertise within their offices").  See also CPCS, Immigration Impact Unit, https://www.publiccounsel.net/iiu [http://perma.cc/3D3Y-NFT2] (inviting CPCS staff attorneys and bar advocates to fill out intake form to seek assistance in "analyzing the immigration consequences for a client"); Immigration Defense Project, Hotline, http://immigrantdefenseproject.org/hotline [http://perma.cc/F54J-YVBU] (free hotline that offers "criminal-immigration analyses to criminal defenders, immigration advocates, and immigrants and their loved ones").  Cf. <u>State</u> v. <u>Sandoval</u>, 171 Wash. 2d 163, 172 (2011) ("counsel was required to correctly advise, or seek consultation to correctly advise, [the defendant] of the deportation consequence").

at 47, quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985). "At a minimum, this means that the defendant must aver that to be the case." Clark, supra. Additionally, the defendant must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Clarke, supra, quoting Padilla, 559 U.S. at 372. The judge must determine, based on the credible facts, whether there is a reasonable probability that a reasonable person in the circumstances of the defendant would have chosen to go to trial had he or she received constitutionally effective advice from his or her criminal defense attorney regarding the immigration consequences of a guilty plea.[16] Clarke, supra. See Ferrara v. United States, 456 F.3d 278, 294 (1st Cir. 2006) ("The elementary question is whether a reasonable defendant standing in the petitioner's shoes would likely have altered his [or her] decision to plead guilty . . ."). See also Commonwealth v. Scott, 467 Mass. 336, 361 (2014) (prejudice standard in Clarke

---

[16] In making this determination, a judge may evaluate the credibility of the defendant and other witnesses in determining the facts, but a judge does not evaluate the credibility of the defendant's assertion that he or she would have gone to trial had the defendant known then what the defendant knows now. Rather, a judge must evaluate that assertion under a reasonable person standard, because a judge cannot evaluate whether the defendant is telling the truth about a decision the defendant never made.

"is identical to, and draws from the same source as, the standard in Ferrara").

To prove that rejecting the plea would have been rational under the circumstances, "the defendant bears the substantial burden of showing that (1) he [or she] had an 'available, substantial ground of defence,' . . . that would have been pursued if he [or she] had been correctly advised of the dire immigration consequences attendant to accepting the plea bargain; (2) there is a reasonable probability that a different plea bargain (absent such consequences) could have been negotiated at the time;[17] or (3) the presence of 'special circumstances' that support the conclusion that he placed, or would have placed, particular emphasis on immigration consequences in deciding whether to plead guilty." Clarke, 460 Mass. at 47-48. Here, the defendant attests that he would not have pleaded guilty to the assault by means of a dangerous weapon charge had he been advised of its immigration consequences; he does not challenge his plea to the other counts, or his plea in the other cases.

---

[17] Because the defendant does not contend that there is a "reasonable probability that a different plea bargain . . . could have been negotiated," we do not address this possibility. Commonwealth v. Clarke, 460 Mass. 30, 47 (2011).

Having so attested, the defendant argues that, had he been properly advised of the immigration consequences, there is a reasonable probability that a reasonable person in his circumstances would have chosen to go to trial on the assault by means of a dangerous weapon charge for two reasons. First, he contends that he had a substantial defense to this charge. "Under the common law, an assault may be accomplished in one of two ways -- either by an attempted battery, or by putting another in fear of an immediately threatened battery." Commonwealth v. Gorassi, 432 Mass. 244, 247 (2000). The defendant correctly asserts that, under the circumstances described in the police report, the Commonwealth in this case would have needed to proceed under the theory of an immediately threatened battery. "Under the immediately threatened battery category, what is essential is that the defendant intended to put the victim in fear of imminent bodily harm, not that the defendant's actions created a generalized fear . . . in the victim." Id. at 248-249. "The victim's apprehension of imminent physical harm must be reasonable." Commonwealth v. Werner, 73 Mass. App. Ct. 97, 102 (2008). "In determining whether an apprehension of anticipated physical force is reasonable, a court will look to the actions and words of the defendant in light of the attendant circumstances." Commonwealth v. Gordon, 407 Mass. 340, 349 (1990).

The defendant argues that, where the police report declares that the defendant "dropped the stick into the water and came on shore" after the officer, who was on the river bank, used pepper spray on him, the defendant had a substantial defense that the officer reasonably could not have been in fear of imminent bodily harm. In addition, the defendant in his affidavit attested that he simply held on to a "branch" he found floating in the water to maintain his balance against the strong current and soft river bottom in the cold water, and never intended to threaten a police officer with the branch.

The judge made no factual findings as to whether this was a substantial defense, or as to the credibility of the assertions in the police report.[18] Specifically, he made no finding as to whether the defendant held a "stick" or a "branch" in the water (or as to its size), or how far from shore the defendant was

---

[18] The defendant initially sought to vacate his plea to the charge of assault by means of a dangerous weapon based in part on the claim that the Commonwealth had failed to proffer evidence at the plea hearing sufficient to support each of the elements of this charge. The judge, in denying the defendant's motion for a new trial, addressed this claim by rejecting it "summarily." In the motion for reconsideration, the defendant focused on the claim that he was not advised of the immigration consequences of a plea to this charge. In denying this motion, the judge found only that the defendant "would have had little if any leeway in successfully defending the outcome of Docket #0523CR2847," but this case docket includes all the counts, including the counts of operating while under the influence and leaving the scene of property damage, for which the defendant had no substantial defense.

when he dropped it. Without these credibility determinations and factual findings, which would require a new evidentiary hearing, we cannot determine whether a reasonable person in the defendant's position in 2005 would have thought he or she had a substantial defense to this charge.[19]

Second, the defendant contends that his refugee status alone established the presence of "special circumstances," and that the presence of special circumstances necessarily establishes prejudice. We agree that a defendant's refugee status is a special circumstance and that the presence of special circumstances alone <u>might</u> establish prejudice, but we do not agree that the presence of special circumstances alone <u>necessarily</u> establishes prejudice.

We have recognized that, in evaluating a proposed plea offer, "a noncitizen defendant confronts a very different calculus than that confronting a United States citizen." <u>DeJesus</u>, 468 Mass. at 184. "For a noncitizen defendant, preserving his [or her] 'right to remain in the United States

---

[19] To show that a "substantial defense" was available, the defendant need not show that it was more likely than not that such a defense would have resulted in acquittal. See <u>United States</u> v. <u>Orocio</u>, 645 F.3d 630, 643 (3d Cir. 2011), abrogated on other grounds by <u>Chaidez</u> v. <u>United States</u>, 133 S. Ct. 1103 (2013) ("The Supreme Court . . . requires only that a defendant could have rationally gone to trial in the first place, and it has never required an affirmative demonstration of likely acquittal at such a trial as the sine qua non of prejudice").

may be more important to [him or her] than any jail sentence.'" Id., quoting Padilla, 559 U.S. at 368. "Thus, a determination whether it would be rational for a defendant to reject a plea offer 'must take into account the particular circumstances informing the defendant's desire to remain in the United States.'" DeJesus, supra, quoting People v. Picca, 97 A.D.3d 170, 183-184 (N.Y. 2012).

A defendant may fervently desire to remain in the United States because of the depth and quality of the roots he or she has planted in this country. For example, in DeJesus, supra at 183-184, the defendant established special circumstances where he "had a lot to lose if he were to be deported," considering that "he had been in the country since he was eleven years old, his family was in Boston, and he had maintained steady employment in the Boston area." Where the defendant is a refugee, however, a judge must also consider that the defendant might fervently desire to remain in the United States because of what he or she might face if deported, that is, the risk of persecution in his or her country of origin or the alternative of being deported to a country that might never have been that person's home, if that country would agree to accept that person. See Mamouzian v. Ashcroft, 390 F.3d 1129, 1136 (9th Cir. 2004), quoting Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987) ("deportation is a

'harsh measure . . . all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country'"). See also 8 U.S.C. § 1231(b)(2) (2012) (procedure by which United States Attorney General determines country where noncitizen shall be removed); United States Department of Justice, Fact Sheet:  Asylum and Withholding of Removal Relief Convention Against Torture Protections (Jan. 15, 2009) (relief in form of "withholding of removal" prohibits removal to country where noncitizen's life or freedom would be threatened, "but allows removal to a third country where [the person's] life or freedom would not be threatened").  Therefore, a defendant's refugee status, by itself, is also a special circumstance.

But special circumstances do not necessarily require a finding of prejudice.  As stated in Clarke, 460 Mass. at 47-48, special circumstances simply "support the conclusion" that the defendant would have placed particular emphasis on immigration consequences in deciding whether to plead guilty; their presence does not require the conclusion that there is a reasonable probability that the special circumstances would have caused the defendant to choose to go to trial.  The prejudice determination rests on the totality of the circumstances, in which special circumstances regarding immigration consequences should be given substantial weight.  See Ferrara, 456 F.3d at 294 ("The ultimate

aim, common to every case, is to ascertain whether the totality of the circumstances discloses a reasonable probability that the defendant would not have pleaded guilty absent the misconduct"). See also Clarke, supra at 48 n.19 (noting that in State v. Sandoval, 171 Wash. 2d 163, 175, 176 [2011], court gave "heavy weight" to fact that defendant had been "very concerned" about risk of deportation). Because a defendant's refugee status is the result of a prior determination by the Federal government that deportation may be an especially severe and dangerous consequence, refugee status is entitled to particularly substantial weight in evaluating the totality of circumstances. Thus, refugee status, in essence, is a "special" special circumstance.[20]

---

[20] A judge may consider other factors in the totality of the circumstances analysis including, but not limited to, the "defendant's assessment of the strength of the prosecution's case in relation to [the defendant's] own case." People v. Martinez, 57 Cal. 4th 555, 564 (2013). Where there are special circumstances such as a defendant's refugee status that might cause a defendant to fear deportation far more than a more severe sentence upon conviction, there may be a reasonable probability that a defendant would choose to go to trial even without a substantial defense, based on the small chance that the defendant would prevail at trial and avoid deportation. But depending on the circumstances, where the evidence against a defendant is so overwhelming that a defendant has virtually no chance of prevailing at trial, the presence of special circumstances might not be enough to show that it was reasonably probable that the defendant would have forgone the benefits of a plea offer in favor of proceeding to trial. See Clarke, 460 Mass. at 47 (defendant must show that decision to reject plea bargain would have been "rational under the circumstances").

The judge may also consider "the risks faced by a defendant in selecting a trial rather than a plea bargain." United States v. Kayode, 777 F.3d 719, 726 (5th Cir. 2014). This may include the risk that a conviction would result in a sentence at or close to the "maximum allowable sentence had [the defendant] gone to trial," Commonwealth v. Roberts, 472 Mass. 355, 365 (2015), or the risk that a conviction at trial would result in a mandatory minimum sentence substantially more severe than the sentence offered through a guilty plea to a lesser charge. Additionally, a defendant who faces only a house of correction sentence if convicted at trial may be more willing to forgo a plea bargain to avoid the risk of deportation than a defendant facing the possibility of a lengthy State prison sentence.

In some cases, the judge might also consider the extent to which an acquittal at trial would reduce or eliminate the risk of immigration consequences. A defendant who can eliminate the risk of deportation through an acquittal is more likely to insist on going to trial than a defendant who is deportable regardless of the outcome at trial. See, e.g. People v. Haley, 96 A.D.3d 1168, 1169 (N.Y. 2012) (no prejudice where "regardless of whether defendant pleaded guilty . . . , had been found guilty after trial or had been acquitted, his status as a deportable alien would not have been affected").

"Ultimately, a defendant's decision to tender a guilty plea is a unique, individualized decision, and the relevant factors and their relative weight will differ from one case to the next." Roberts, supra at 365-366, quoting Commonwealth v. Scott, 467 Mass. 336, 356 (2014). Under certain circumstances, even the near certainty of a lengthy State prison sentence if convicted may not deter a rational defendant from risking trial to preserve the possibility of acquittal. See Padilla, 559 U.S. at 368, quoting Immigration & Naturalization Serv. v. St. Cyr, 533 U.S. 289, 322 (2001) (preserving defendant's right to remain in United States may be more important than "any potential jail sentence"); Orocio, 645 F.3d at 645 (defendant facing ten-year minimum sentence "rationally could have been more concerned about a near-certainty of multiple decades of banishment from the United States than the possibility of a single decade in prison").

A refugee seeking a new trial on these grounds and the prosecutor opposing the motion are entitled to offer evidence regarding the scope and severity of persecution that the refugee was likely to have faced in his or her country of origin at the time of the plea had the refugee been deported, because this is relevant to the importance a reasonable person in the defendant's position would place on immigration consequences. Because direct evidence of this nature is rarely practicable, the same reliable hearsay information that an asylum officer may consider in deciding an asylum application is admissible at an evidentiary hearing in a refugee's motion for a new trial. See 8 C.F.R. § 208.12(a) (2011) ("asylum officer may rely on material provided by the Department of State, other [United States Citizenship and Immigration Services] offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions").[21]

There is nothing in the judge's findings and order on the defendant's motion for a new trial or for reconsideration that suggests that he considered the defendant's refugee status in

---

[21] A defendant with refugee status is not required to present evidence establishing the country conditions at the time of the plea for this special circumstance to receive particularly substantial weight.

finding the absence of prejudice. The failure to consider this special circumstance is an error of law that requires that the judge's denial of the motion for a new trial and the motions for reconsideration be vacated and the matter remanded.[22]

On remand, in deciding anew the question of prejudice, the judge will need to consider that this motion for a new trial differs from the more typical case where a defendant contends that defense counsel did not give fair warning that "if Federal authorities apprehended the defendant, deportation would be practically inevitable." DeJesus, 468 Mass. at 181. Here, the defendant does not seek to withdraw his guilty pleas to the charges of malicious destruction of property and knowingly receiving stolen property that formed part of the "global resolution" of his pending matters, and he does not dispute that these are crimes of moral turpitude that alone make him

---

[22] The judge also appeared to err in finding no prejudice because the defendant "was more than satisfied" with the plea bargain "at that time." The question is not whether the defendant was satisfied with the plea bargain at the time, having received inadequate advice about the immigration consequences of a conviction, but whether there is a reasonable probability that, in the absence of counsel's errors, a reasonable person in the defendant's position would have chosen to go to trial on the assault by means of a dangerous weapon charge rather than accept the plea offer. See Commonwealth v. DeJesus, 468 Mass. 174, 184 (2014) (rejecting Commonwealth's argument that defendant was not prejudiced because he "got a very good deal" in receiving "straight probation when he was facing a mandatory minimum sentence of five years of incarceration").

deportable.[23]  In light of those other pleas, his plea to the charge of assault by means of a dangerous weapon does not affect whether he is deportable.  Rather, the relevant immigration consequence of his plea to that charge is the substantial risk of losing a viable avenue for discretionary relief because, unless the defendant is a "violent or dangerous" individual, a defendant who is a refugee has such a viable avenue even where the defendant has committed crimes of moral turpitude that render him deportable.  It was not clear in 2005 that a guilty plea to assault by means of a dangerous weapon would classify

---

[23] Because the defendant does not challenge whether malicious destruction of property and knowingly receiving stolen property are crimes of moral turpitude, we need not determine whether they are.  Although it was clear at the time of the plea in 2005 that knowingly receiving stolen property was a crime involving moral turpitude, see Goncalves v. Reno, 144 F.3d 110, 114 (1st Cir. 1998); Matter of L, 61 I. & N. Dec. 666, 668 (B.I.A. 1955), there is disagreement as to whether it was clear in 2005 that malicious destruction of property involves moral turpitude.  See Da Silva Neto v. Holder, 680 F.3d 25, 30 (1st Cir. 2012) (noting that there was "no case law directly on point" in affirming conclusion of board of immigration appeals that malicious destruction of property under Massachusetts law is crime involving moral turpitude).  See also Commonwealth v. Balthazar, 86 Mass. App. Ct. 438, 442-443 (2014) (in 2009, "legal research would have indicated" that malicious destruction of property is crime involving moral turpitude); Hernandez-Robledo v. Immigration & Naturalization Serv., 777 F.2d 536, 541-542 (9th Cir. 1985) (declining to announce per se rule that every incident of property destruction involves moral turpitude, but affirming determination of board of immigration appeals that petitioner's conviction of malicious destruction of property involved moral turpitude).

the defendant as "violent or dangerous" under In re Jean.[24]  But it was clear at that time that, if the defendant were not convicted of the charge of assault by means of a dangerous weapon, there was virtually no risk that the defendant would be subjected to the heightened standard regarding the grant of a discretionary waiver of inadmissibility, because he had no prior convictions for crimes that could be construed as violent or dangerous.  And it was also clear that, if he pleaded guilty to this charge, there would be a substantial risk that, having admitted to a violent crime, he would be subjected to the

---

[24] The defendant argues that assault by means of a dangerous weapon is a "crime of violence," as defined in 18 U.S.C. § 16 (2012), see Almon v. Reno, 214 F.3d 45, 46 (1st Cir. 2000), and that it was clear in 2005 that a conviction of a "crime of violence" necessarily classifies an individual as "violent or dangerous."  In re Jean, 23 I. & N. 373, 383 (A.G. 2002).  There was Federal precedential support for this position prior to the defendant's plea.  See Togbah v. Ashcroft, 104 Fed. Appx. 788, 794 (3d Cir. 2004) (Attorney General "created a heightened standard for cases of aliens who are inadmissible due to their convictions for crimes of violence" [emphasis added]).  There was also Federal precedential support for the proposition that the two categories were not necessarily equivalent, and that an immigration judge may look beyond the elements of the crime to determine whether, based on the underlying facts, an individual should be deemed "violent or dangerous."  See In re Jean, supra (heightened standard applies to violent or dangerous "individuals," and United States Attorney General relied on underlying facts of crime in finding refugee to be violent and dangerous).  Cf. Makir-Marwil v. Attorney General, 681 F.3d 1227, 1235 (11th Cir. 2012) ("Some crimes may be so serious and depraved that the [immigration judge] need only consider the elements of the offense to determine that the alien is violent or dangerous.  Sometimes the [immigration judge] may delve into the facts and circumstances of the prior offenses to determine whether the alien is violent or dangerous").

heightened standard and that, under that standard, he would have virtually no chance of obtaining a discretionary waiver. Therefore, the clear immigration consequence of the defendant's plea to the assault by means of a dangerous weapon charge was the substantial risk that he would lose a viable opportunity for discretionary relief. The United States Supreme Court has recognized, as do we, the significance of this immigration consequence. See Padilla, 559 U.S. at 368, quoting Immigration & Naturalization Serv. v St. Cyr, 533 U.S. 289, 323 (2001) ("'preserving the possibility of' discretionary relief from deportation . . . 'would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial'"). The motion judge must determine whether the defendant was prejudiced by counsel not advising him of this consequence.[25]

---

[25] We recognize that in Padilla, 559 U.S. at 368-369, the United States Supreme Court drew a distinction between "truly clear" and unclear immigration consequences in determining what advice counsel is required to offer. Here, the substantial risk of losing a viable opportunity for discretionary relief is a clear consequence of the defendant's plea to the charge of assault by means of a dangerous weapon, and the consequence is no less clear because it is a risk rather than a certainty. Where, as here, the defendant is a refugee and deportable, counsel should have advised the defendant of that risk. We need not determine whether this result is dictated by Federal constitutional law; it is sufficient that it is dictated by art. 12 of the Massachusetts Declaration of Rights.

Therefore, we remand the case to the District Court with instructions to conduct an evidentiary hearing regarding prejudice.  In deciding whether there is a reasonable probability that the defendant would have chosen to go to trial on the charge of assault by means of a dangerous weapon had he been competently advised of the immigration consequences of a guilty plea, the special circumstance of the defendant's refugee status must be given particularly substantial weight in the totality of circumstances.  Here, the critical factual determination for the judge is what a reasonable defendant, under the circumstances, would have estimated to be the chance of acquittal on that charge had he gone to trial, bearing in mind that, in light of the weight to be given to the defendant's refugee status and the fact that the defendant faced only a house of correction sentence if convicted in the District Court, even a small chance of acquittal may be sufficient to show that it was reasonably probable that a person in the position of the defendant would have rejected the plea and insisted on going to trial.

Conclusion.  The orders denying the defendant's motion for a new trial and the motions for reconsideration are vacated, and the matter is remanded to the District Court for proceedings consistent with this opinion.

So ordered.