NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

22-P-1081                                        Appeals Court

COMMONWEALTH  vs.  TARON T., a juvenile.

No. 22-P-1081.

Berkshire.     December 1, 2023. – May 24, 2024.

Present:  Wolohojian, Milkey, & D'Angelo, JJ.[1]


Alien.  Indecent Assault and Battery.  Assault and Battery by
     Means of a Dangerous Weapon.  Assault with Intent to Rape.
     Youthful Offender Act.  Constitutional Law, Plea,
     Assistance of counsel.  Due Process of Law, Plea,
     Assistance of counsel.  Practice, Criminal, Plea,
     Assistance of counsel.




     Indictments found and returned in the Superior Court
Department on October 31, 2013.

     A motion to withdraw a plea of guilty, filed on April 1,
2021, was heard by David B. Paradis, J., and a motion for
reconsideration was considered by him.


     Eva G. Jellison for the juvenile.
     Patrick Sadlon, Assistant District Attorney, for the
Commonwealth.


_____

     [1] Justice Wolohojian participated in the deliberation on
this case while an Associate Justice of this court, prior to her
appointment as an Associate Justice of the Supreme Judicial
Court.

MILKEY, J.  In 2013, the juvenile, then sixteen, sexually assaulted three other boys at a high school soccer camp.  He eventually pleaded to being adjudicated a youthful offender with respect to two counts of indecent assault and battery of a person fourteen years or older, and three counts of assault and battery by means of a dangerous weapon (ABDW).  As part of the plea agreement, the juvenile also agreed to be adjudicated delinquent with respect to two counts of assault with intent to rape a child.  In 2021, the juvenile filed a motion to withdraw his youthful offender plea on the ground that his counsel had not provided him adequate advice about the immigration consequences of the plea.  See Padilla v. Kentucky, 559 U.S. 356, 359-360, 374 (2010).  After holding an evidentiary hearing, a Juvenile Court judge, who was not the plea judge, denied that motion.  We agree with the motion judge that the juvenile is unable to demonstrate prejudice from any inadequate advice given by plea counsel.  We also are unpersuaded by the juvenile's argument that his plea was not knowing and voluntary.  We therefore affirm.

Background.  The juvenile is a Brazilian citizen who came to the United States with his mother on a tourist visa in 2000.  Overstaying that visa, he settled in Somerville where he joined a soccer team at his high school.  In the summer of 2013, as a

rising junior, the juvenile attended a soccer camp in Otis with his team.

1. The sexual assaults. On August 25, 2013, the juvenile, along with two cohorts (codefendants), went to the freshman cabin where they sexually assaulted three other students. Unlike most sexual assaults, there were many eyewitnesses to the attack, at least eight of whom were interviewed by the police and testified to the grand jury. There was also photographic evidence of the attack in progress. Although eyewitness accounts of the incident differed in some respects, they were consistent with respect to the most significant facts. At the plea hearing, the prosecutor provided a proffer about the sexual assaults. We begin by summarizing that account.

When the juvenile and his codefendants entered the freshman cabin, they announced that "[t]here's going to be a beat down" (or words to that effect). Then, armed with a broomstick, they proceeded to attack each of the three victims (to whom we refer by pseudonyms). The juvenile assaulted Colin with the broomstick, pressing it against his buttocks. The juvenile then tried to pull down Juan's pants, and he touched Juan's genitals through his clothing. The third victim, Manny, fared the worst. With Manny's shorts pulled down, the juvenile "took the broom and placed it between [Manny's] buttocks near his anal opening." This caused Manny to bleed, and his blood was found on the cabin

floor.  Other boys observed that Manny's rectal area "was red, swollen, abraded, scratched, bleeding, etcetera."

At the plea hearing, the juvenile admitted to the truth of the factual account recited by the prosecutor.  Through his motion to withdraw his plea, he did not seek to disavow those admissions, but brought additional facts to the judge's attention, including details about the crimes.  The Commonwealth likewise submitted additional factual material that went significantly beyond the sanitized version of events offered at the plea hearing.  As a result of the parties' respective efforts, the motion judge had before him an enormous amount of documentary material, including, among other items, police reports, witness interviews, grand jury minutes, various proffers as to experts who might have testified if the matter had gone to trial, and materials related to the juvenile's immigration proceedings.  In addition, both in the Juvenile Court and on appeal, the juvenile cited to numerous scholarly articles.  We briefly review some of the additional material, but do so only to the extent necessary to address the juvenile's arguments on appeal.

2.  Hazing.  The juvenile seeks to portray the soccer camp incident not as a sexual assault, but as a product of a "culture of hazing" prevalent in youth sports.  Borrowing from the scholarly literature, he adopts the following definition of

hazing as "any activity expected of someone joining a group that humiliates, degrades, abuses, or endangers, regardless of the person's willingness to participate."[2]  See Parks & DeLorenzo, "Hazing in High School Athletics:  An Analysis of Victims," 29 Marq. Sports L. Rev. 451, 480 (2019).  The juvenile maintains that his actions were driven not by sexual desire but by "an intent tied to the hazing culture."  He also argues that, as a victim of past hazing himself, such behavior had become "normalized" for him.  The juvenile points to two hazing experts whom he could have called in his defense had the case gone to trial.

3.  Consent.  The juvenile also contends that had there been a trial, he might have been able to convince jurors that Manny consented to the indecent assault and battery with the broomstick.  Although that is a dubious proposition, as discussed below, we turn now to a fuller account of the attack on Manny, as described by him and other eyewitnesses.  According to them, the juvenile approached Manny and told him that he was "gonna get it now."  The juvenile then gave Manny the choice of "get[ting] the broom up [his] behind" or having "Icy Hot

---

[2] Neither party has discussed the fact that the Legislature itself has both defined "hazing" and made it a crime.  See G. L. c. 269, § 17.

[rubbed] all over [his] testicles and [his] behind."[3]  Manny at first refused to make that choice, but later reluctantly indicated his preference for the broomstick.  The juvenile then told Manny, whose pants were pulled down, to bend over, and then "with all his force pulled -- put it in."[4]

4.  <u>Penetration</u>.  In his proffer at the plea, the prosecutor made no claim that the juvenile penetrated Manny's anus with the broomstick.  That issue would have been relevant to whether the juvenile had committed forcible rape of a child (an offense for which the juvenile had been indicted but that was nol prossed as part of the plea agreement).  The documentary evidence before the motion judge included statements by Manny that he believed there was penetration, and of other witnesses describing Manny's injuries to include a sore like "a really, really big blister . . . like a really big bubble that was really, really bright red."  As mentioned above, there was also blood on the floor of the cabin.  However, a doctor who examined

---

[3] We take judicial notice that Icy Hot is marketed as a pain relief cream containing menthol.  See https://www.icyhot.com/en-us/products/creams-rubs/pain-relief-cream [https://perma.cc/734S-BRUY].

[4] The witness accounts of the attacks on the other two victims similarly include some graphic detail that goes beyond the plea proffer.

Manny three days later noted that the broomstick "was not really inserted rectally but scraped [Manny]."[5]

5.  The plea agreement.  A grand jury indicted the juvenile, as a youthful offender, for one count of rape of a child with force, two counts of assault with intent to rape, three counts of ABDW, and one count of indecent assault and battery on a person over the age of fourteen.  As noted, on April 6, 2015, the juvenile pleaded to being adjudicated a youthful offender with respect to two counts of indecent assault and battery, and three counts of ABDW, and to being adjudicated delinquent on two counts of assault with intent to rape a child.  Before accepting the juvenile's plea, the plea judge engaged in the standard colloquy designed to ensure the plea was knowing and voluntary.  This colloquy included the judge's warning to the juvenile "that if [he was] not a citizen of the United States, that under federal law, a plea that you are a youthful offender, okay, to the offenses, may result in deportation and exclusion from the United States of America or a denial of naturalization."  See G. L. c. 278, § 29D.  The juvenile affirmatively indicated that he understood this.  Pursuant to the plea agreement, the juvenile was committed to the Department

---

[5] The soccer coaches who led the camp learned about the assaults two days later.  They immediately informed the police, and Manny was taken to the hospital.

of Youth Services (DYS) until he turned twenty-one, and he received a suspended prison sentence of three to four years.

6. <u>Plea counsel's advice on immigration consequences</u>. Although plea counsel's principal focus was keeping the juvenile out of jail, he knew that the juvenile faced possible immigration repercussions from his criminal proceedings.  In fact, the United States Immigration and Customs Enforcement (ICE) arrested the juvenile for overstaying his tourist visa shortly after his arrest on the State charges.  See 8 U.S.C. § 1227(a)(1)(B).  Thus, the juvenile and defense counsel knew he was facing potential deportation while his plea agreement was negotiated.

Plea counsel consulted with an attorney at the Committee for Public Counsel Services Immigration Impact Unit about the immigration consequences of the charges and of possible plea agreements.  Through this process, plea counsel learned that, at the time, it was unclear whether youthful offender adjudications would be considered "convictions" for immigration purposes. This created some uncertainty about the immigration consequences of the juvenile's being adjudicated a youthful offender (whether by plea agreement or otherwise).  However, plea counsel was aware that, assuming that a plea to being a youthful offender did not automatically bar the juvenile from being allowed to stay, his fate still would depend on the discretion of a Federal

immigration judge.  This was a serious concern because of the nature of the underlying offenses, all of which are considered crimes of "moral turpitude" under Federal immigration law.  See 8 U.S.C. § 1182(a)(2)(A) (admission of crime of moral turpitude or elements that comprise one can be independent ground of inadmissibility).[6]  As plea counsel put it, he "knew that [the juvenile] would be rolling the dice on immigration consequences by taking the . . . plea" deal.

In an affidavit submitted with the juvenile's new trial motion, plea counsel recited that he had "told [the juvenile] about the potential immigration consequences" of pleading to being a youthful offender.  Plea counsel clarified during the evidentiary hearing that his advice was not "super specific," but that he "always" advised his clients "to assume the worst . . . [s]o, for the purposes of this discussion, you know, 'Mr. Client, assume that you're getting deported.'"  That plea counsel painted a decidedly pessimistic picture of the

---

[6] Crimes involving moral turpitude are not defined by statute, but are generally any crime that "involve[s] both reprehensible conduct and some degree of scienter, whether specific intent, deliberateness, willfulness, or recklessness." Matter of Silva-Trevino, 24 I.&N. Dec. 687, 689 n.1 (A.G. 2008), vacated on other grounds by Matter of Silva-Trevino, 26 I.&N. Dec. 550, 553 (A.G. 2015).  Crimes involving moral turpitude have included rape, Matter of Z, 7 I.&N. Dec. 253 (BIA 1956); indecent assault and battery on a person fourteen years or older, Maghsoudi v. INS, 181 F.3d 8 (1st Cir. 1999); and ABDW, Matter of O, 3 I.&N. Dec. 193 (BIA 1948).

immigration consequences of a plea agreement is confirmed by notes taken by a social worker assigned to the juvenile as a "social services advocate."[7]  Those notes, which provide a contemporaneous account of the juvenile's state of mind, state in pertinent part as follows:

> "met w[ith] [the juvenile] at his home . . . he was very relaxed and hopeful that he would be able to plea[d] guilty on Monday . . . he was advised of the immigration law uncertainty . . . [plea counsel] advised him flat out assume under any plea that he would be deported . . . he was well aware and accepting of this . . . he is ready to move on . . . has no problem with proposed resolution . . . commitment to 25."

As the motion judge found, the social worker's notes establish that the juvenile understood the potential consequences of his plea and was at peace with them.

7.  Immigration proceedings.  In 2017, when his commitment to DYS had ended, the juvenile was re-arrested by ICE.  In the ensuing Federal proceedings, the juvenile pursued discretionary relief to stay in the United States on various grounds, including a request that he be given status as a permanent resident based on his ties to his mother and stepfather.[8]  Although the stated reason for the juvenile's arrest by ICE was,

---

[7] The juvenile included those notes in a voluminous appendix that he submitted with his motion for new trial.  He raises no claim that the judge was limited in what use he could make of them.

[8] His stepfather was an American citizen, and his mother was in the process of receiving her "green card."

as before, for overstaying his visa, the proceedings focused on the sexual assaults on which his plea was based.  The immigration judge ruled that Massachusetts youthful offender adjudications are not convictions under immigration law, but she nevertheless denied the juvenile the discretionary relief that would have allowed him to avoid deportation.  She considered various positive factors that the juvenile had brought forward, but in the end deemed these outweighed by the nature and severity of the sexual assaults, which the juvenile independently admitted to having committed in the immigration proceedings.

Having overstayed his visa and having been deemed inadmissible to remain, the juvenile was deported to Brazil in 2018.  He since reentered the United States unlawfully and he was once again arrested by ICE.  The current status of his immigration proceedings is not clear.[9]

Discussion.  On appeal, the juvenile argues that his plea to being a youthful offender should be vacated because he did not understand its immigration consequences.  He advances two theories in support of that claim.  The first, based on Padilla,

---

[9] The juvenile suggested at oral argument that Federal immigration officials may be awaiting the outcome of the appeal before us.  Regardless of whether this is true, and regardless of whether the appeal has any bearing on the outcome of any pending immigration proceedings, the controversy before us does not appear to be moot.

is that his plea counsel was ineffective by failing to inform him of the clear consequences of the plea. The second is that his plea was not knowing or voluntary and therefore a violation of due process. We address these arguments in turn.

1. _Ineffective assistance of counsel_. Under _Padilla_, an attorney must inform a defendant of the clear immigration consequences of a guilty plea in order to ensure the defendant's Sixth Amendment right to effective assistance of counsel. _Padilla_, 559 U.S. at 369. To succeed on a _Padilla_ claim, a defendant must show both that the advice counsel provided was deficient, and that the defendant was prejudiced by counsel's errors. _Id_. at 366, citing _Strickland_ v. _Washington_, 466 U.S. 668, 687 (1984). To show prejudice in this context, a defendant must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty." _Commonwealth_ v. _Clarke_, 460 Mass. 30, 47 (2011), quoting _Hill_ v. _Lockhart_, 474 U.S. 52, 59 (1985).

A. _Adequacy of advice_. As noted, at the time the juvenile changed his plea, he already was facing deportation for having overstayed his tourist visa. However, as the subsequent immigration proceedings well illustrate, State charges can result in the loss of discretionary defenses to deportation even if they are not the nominal reason why deportation proceedings were initiated. From the perspective of someone in the

juvenile's shoes, the key question is whether and, if so, how resolution of the criminal charges will affect his ability to stay in the United States.  The Supreme Judicial Court has stated that a "substantial risk of losing a viable opportunity for discretionary relief is a clear consequence" of which counsel should inform the juvenile.  Commonwealth v. Lavrinenko, 473 Mass. 42, 63 n.25 (2015).  See Commonwealth v. Lopez, 96 Mass. App. Ct. 34, 39 n.8 (2019) (Wendlandt, J.) ("in some circumstances . . . it may constitute ineffective assistance not to warn about the specific inadmissibility consequences of a guilty plea").

The extent of a plea counsel's obligations under Padilla is tied to the clarity of the law regarding the immigration consequences of the plea.  See Commonwealth v. DeJesus, 468 Mass. 174, 180-181 (2014).  Where the consequences are clear, as in DeJesus, it is not enough for plea counsel to provide general advice that the juvenile may face deportation.  Id. at 180-182. It follows, however, that where the consequences are not clear, counsel may have more latitude in the advice given.  Here, in the face of uncertainty in the applicable law, plea counsel told the juvenile that he should assume he would be deported if he

tendered his youthful offender plea.[10]  The motion judge concluded that, by communicating to the juvenile that he faced severe risks of being deported from his plea, plea counsel satisfied his obligations under Padilla.  Insofar as plea counsel characterized the immigration risks that the juvenile faced if he tendered the plea, we agree with the judge that this did not amount to ineffective assistance.

We are not yet done, however, because the risks posed by the plea itself make up only half the equation.  Someone deciding whether to plead guilty may not be in a position to assess fully the immigration consequences of doing so unless that person also adequately has been informed of the immigration risks of proceeding to trial.  Otherwise, a defendant may not have a point of comparison to weigh the consequences of pleading guilty.  Accordingly, plea counsel advising noncitizen clients whether to plead guilty (or in this case, being a youthful offender) should consider and discuss with their clients the immigration consequences of going to trial.  See Commonwealth v. Marinho, 464 Mass. 115, 124-127 (2013).

---

[10] With the benefit of hindsight, we note that, if anything, the advice plea counsel provided was unduly pessimistic. Although the juvenile ultimately was unable to convince the immigration judge to grant him the discretionary relief he sought, he had -- at the time he offered his plea -- a potentially viable path to remaining in the country.

In the case before us, plea counsel -- whose testimony the motion judge generally appears to have credited -- unequivocally testified that he never discussed with his client what immigration consequences the juvenile would face had he gone to trial.  There was no evidence to the contrary.  If the judge implicitly credited plea counsel's testimony on this point, then an argument could be made that the advice counsel provided about the immigration consequences of pleading guilty was inadequate.  In the end, we need not resolve these issues, because we agree with the judge that, in any event, the juvenile is unable to demonstrate prejudice.

B.  <u>Prejudice</u>.  There are three ways in which someone in the juvenile's position can demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty."  <u>Clarke</u>, 460 Mass. at 47.  These are as follows:

> "that (1) he had an 'available, substantial ground of defence' . . . that would have been pursued if he had been correctly advised of the dire immigration consequences attendant to accepting the plea bargain; (2) there is a reasonable probability that a different plea bargain (absent such consequences) could have been negotiated at the time; or (3) the presence of 'special circumstances' that support the conclusion that he placed, or would have placed, particular emphasis on immigration consequences in deciding whether to plead guilty" (citation omitted).

<u>Clarke</u>, 460 Mass. at 47-48.  We address these in turn.

i.  <u>Available defenses at trial</u>.  The juvenile argues that he had a substantial chance of prevailing on the forcible child rape indictment, because, had the case gone to trial, he would have been armed with medical records that indicated an absence of penetration (albeit based on an examination that took place three days after the sexual assaults).  See <u>Commonwealth</u> v. <u>Nylander</u>, 26 Mass. App. Ct. 784, 791 (1989) (penetration required for rape).  Cf. <u>Commonwealth</u> v. <u>Hrabak</u>, 440 Mass. 650, 656 (2004) (expert testimony required to show that lack of evidence of injury to victim's rectum was consistent with anal rape).  With respect to the indecent assault and battery and ABDW indictments, he contends that even if a jury did not acquit him, they may have convicted him only of simple assault and battery (a lesser included offense of ABDW).  Had they done so, the juvenile argues, this could have significantly increased his chances of staying in the country, because simple assault and battery is not considered a crime of moral turpitude for purposes of Federal immigration law.

We agree with the juvenile in so far as he argues that he might have forged a successful defense to the forcible child rape indictment.  However, this does little to aid his claim that he could have faced more advantageous immigration

consequences had he gone to trial, given that that indictment was nol prossed as part of the plea agreement.[11]

To the extent that the juvenile contends that there was an appreciable chance a jury would have acquitted him altogether, we disagree.  The evidence that the juvenile sexually assaulted the three victims was overwhelming.  Nor are we persuaded that the juvenile had any reasonable chance of prevailing against the indecent assault and battery charges, especially with respect to Manny.  Regardless of whether the Commonwealth could have proven that the juvenile actually penetrated Manny's anus with the broomstick, there was abundant evidence that he jabbed the weapon at least directly next to his anus.[12]  It is undeniable that such an action "intruded upon a private or intimate area of the body so as to be considered 'indecent' within the meaning of the criminal statute."  Commonwealth v. Cruz, 93 Mass. App. Ct.

_____

[11] The juvenile also faced charges of assault with intent to rape Colin and Juan.  If at trial the Commonwealth had presented evidence of the facts contained in the documentary evidence before the motion judge, that would have sufficed to prove those charges.  See Commonwealth v. Walker, 68 Mass. App. Ct. 194, 199 (2007).  Of course, given conflicts in the statements of some eyewitnesses on certain details, it is possible that a jury might have acquitted the juvenile of those charges.  However, as part of the plea agreement, the juvenile agreed only to be adjudicated delinquent on those charges, and neither those charges, nor the resolution of them, were the focus of the immigration proceedings.

[12] Sexual assault cases often turn on the credibility of the victim.  This was not such a case.

136, 140 (2018). Whether the juvenile was motivated by sexual desire is beside the point. See id. at 139 (while context may be important to determine whether touching is indecent or not, "[t]he test for indecency is objective, turning on the nature of the conduct rather than the defendant's intent"). Nor do we see any merit in the juvenile's implausible suggestion that a jury might have concluded that Manny consented to being attacked with the broomstick. As a matter of law, consent was not a legally valid defense available to the juvenile on the forcible rape of a child charge, G. L. c. 265, § 22A, because the victim was under sixteen years old. Beyond that, as a matter of law the victim could not have consented to being beaten with a dangerous weapon, see Commonwealth v. Appleby, 380 Mass. 296, 311 (1980). And, in any event, a consent defense is not available where, as here, the assault and battery was done "with such violence that bodily harm is likely to result." Commonwealth v. Burke, 390 Mass. 480, 482 (1983).

We also do not think that the juvenile had any reasonable chance of convincing a jury that he did not attack Manny and the other victims by means of a dangerous weapon. The juvenile argues that the broomstick was not a dangerous weapon because it was not capable of causing "serious injury," which he argues should be interpreted to mean "injury on [] par with death." This claim is at odds with case law, which has established that

"[a] dangerous weapon is any instrument which, by the nature of its construction or the manner of its use, is capable of causing grievous bodily injury or death, or could be perceived by a reasonable person as capable of such injury." Commonwealth v. Dobson, 92 Mass. App. Ct. 355, 357 (2017), quoting Commonwealth v. Tevlin, 433 Mass. 305, 312 n.3 (2001). We consider it self-evident that forcefully jabbing a broomstick at someone's anus creates a risk of serious injury that qualifies a broomstick used in that manner as a dangerous weapon.

As noted, the juvenile additionally argues that had the case gone to trial, he would have called experts who could have established that his behavior was caused by a "culture of hazing," of which he himself had been a victim. The juvenile's proffer in support of his motion for new trial did not establish that any such expert testimony would have been admissible at trial. Moreover, nothing in the statutes or case law suggests that hazing is a defense to assault and battery. To the contrary, it is now itself a crime. See G. L. c. 269, §§ 17-19. Even if the juvenile's culture of hazing arguments might have been relevant at sentencing, they would not have negated the elements of either indecent assault and battery or ABDW.[13]

---

[13] It bears noting that the Legislature specifically has provided that consent is not available as a defense to the crime of hazing. See G. L. c. 269, § 17.

In sum, we agree with the motion judge that there was little chance that the juvenile could have avoided the immigration consequences of his plea agreement by going to trial.

ii. Better plea deal. As to whether the juvenile might have negotiated a plea agreement that could have avoided adverse immigration consequences, there is simply an absence of proof in the record. For example, the juvenile submitted no evidence of the District Attorney's policies on the negotiation of pleas, or of the substance of any discussions between the prosecutor and defense counsel during plea negotiations. The juvenile points to the fact that the Commonwealth ultimately agreed not to oppose the juvenile's request that he be excused from having to register as a sex offender. We do not view this as any indication that the Commonwealth would have been willing to resolve the case through the juvenile's pleading only to simple assault and battery. Nor do we deem it significant that the Commonwealth entered a nolle prosequi against one of his codefendants. The record reflects that while that codefendant entered the freshman cabin with the juvenile, once inside he had minimal interaction with the victims. By contrast, the evidence that the juvenile actively led the sexual assaults was extremely strong.

iii.  <u>Special circumstances</u>.  The juvenile was able to show that he had strong reasons to want to stay in the United States. At the time of his plea, he had been living in the United States for all but the first four years of his life, had his close family members here, and had a potentially viable path to legal status through his stepfather.  However, the fact that special circumstances may exist does "not require the conclusion that there is a reasonable probability that the special circumstances would have caused the defendant to choose to go to trial." <u>Lavrinenko</u>, 473 Mass. at 58.  The juvenile's claim that special circumstances would have led him to reject the plea agreement if he had properly been advised is undone by the social worker's notes which establish that he expected to be deported and was at peace with that.[14]

---

[14] By demonstrating that the juvenile understood that he faced likely deportation, the social worker's notes also belie the juvenile's claim that plea counsel presented his advice about immigration consequences in a manner that the juvenile was incapable of understanding.  The juvenile additionally argues that even if he in some sense knew that deportation was likely, he still was unable to appreciate the full consequences of what deportation would mean to him, because he was a juvenile with a brain that was not fully developed.  Assuming arguendo that there may be some force to such an argument, it is not at all clear what accommodations to the applicable <u>Padilla</u> framework the juvenile is asserting were warranted as a result.  In any event, on this record and briefing, we conclude that the juvenile has not forged a persuasive argument that the juvenile's age somehow entitles him to reversal.

2. <u>Knowing and voluntary plea</u>. The juvenile also argues that his plea was not knowing and voluntary because he did not understand the immigration consequences of it. To satisfy due process, a plea must be "knowing and voluntary," and a plea does not meet that test if the defendant was never informed of the direct consequences of pleading guilty.[15] <u>Commonwealth</u> v. <u>Najjar</u>, 96 Mass. App. Ct. 569, 571, 576 (2019). The Commonwealth ordinarily bears the burden of proving that a plea was knowing and voluntary. See <u>Commonwealth</u> v. <u>Yardley Y.</u>, 464 Mass. 223, 227 (2013). We review the denial of a motion for new trial based on a claim that a plea was not knowing and voluntary for an abuse of discretion. <u>Id</u>.

The threshold question is whether the due process clause is even implicated by a defendant's purported failure to understand the immigration consequences of a guilty plea. Historically, "[t]he immigration ramifications of a conviction [were] not considered to be direct consequences of being confined."

_____

[15] The cases often speak of a defendant's awareness of the direct consequences of a guilty plea as being relevant to whether a plea was "voluntary." Such awareness perhaps better could be described as relevant to whether the plea was "knowing." Compare <u>Commonwealth</u> v. <u>Roberts</u>, 472 Mass. 355, 363-364 (2015), with <u>Commonwealth</u> v. <u>Najjar</u>, 96 Mass. App. Ct. 569, 576 (2019).

Commonwealth v. Hason, 27 Mass. App. Ct. 840, 843 (1989).[16] Instead, they were considered "contingent" or "collateral" consequences, and a defendant's failure to understand the contingent or collateral consequences of pleading guilty did not render a plea unknowing or involuntary. Id. The juvenile argues that such precedent was altered by Padilla and its progeny. In support of that argument, he points to the fact that the Supreme Judicial Court on occasion has characterized the Padilla Court as having "declined to regard deportation as a mere 'collateral consequence' of criminal conviction." Marinho, 464 Mass. at 124.[17] He suggests that such statements must mean that immigration consequences are "direct," and that it therefore necessarily follows that guilty pleas cannot be considered knowing and voluntary if a defendant is unaware of such consequences. We are unpersuaded.

Despite the dicta in some of the post-Padilla cases, Padilla indisputably is based on the Sixth Amendment right to

---

[16] The "direct consequences" of which a defendant must be made aware for purposes of satisfying the due process clause are those within the jurisdiction of the sentencing judge. See Padilla, 559 U.S. at 365-366, abrogating Commonwealth v. Fuartado, 170 S.W.3d 384, 386 (Ky. 2005).

[17] In Commonwealth v. Chleikh, 82 Mass. App. Ct. 718, 723 (2012), this court cited Padilla for the proposition that "[w]ithout the benefit of [counsel on the risk of deportation], a client cannot enter a knowing and voluntary plea." That dicta is not accurate.

effective counsel, not the due process clause. Padilla, 559 U.S. at 366. Moreover, it is equally indisputable that Padilla did not alter the general rule that lack of knowledge about the consequences of a guilty plea renders such a plea invalid as unknowing or involuntary only when those consequences are direct. See Commonwealth v. Roberts, 472 Mass. 355, 355, 363 (2015) (holding that civil commitment as sexually dangerous person [SDP] is not direct consequence of sexual offense conviction).[18] In sum, we are not persuaded by the juvenile's

---

[18] The defendant in Roberts, 472 Mass. at 355, argued that a Sixth Amendment analysis should be applied to his counsel's failure to inform him that pleading guilty to forcible rape of a child could result in his being civilly confined as a "sexually dangerous person." The Supreme Judicial Court rejected that argument, declining to apply the Padilla analysis to other types of what traditionally had been considered collateral consequences. Id. at 362-364. As the Roberts court put it, "[t]he Sixth Amendment analysis in Padilla did not erode the well-settled principle that a judge's failure to inform a defendant of a collateral consequence -- such as civil confinement -- is, without more, insufficient to render a defendant's guilty plea [unknowing or] involuntary under the due process clause." Id. at 363-364. The court explained that an alternative framework was warranted in Padilla, because deportation in some cases was a "virtually mandatory" result that flowed from a guilty plea, thus rendering deportation "uniquely difficult to classify as either a direct or a collateral consequence." Id. at 363 n.9. In other words, applying a Sixth Amendment framework was appropriate in the Padilla context because of the sui generis nature of immigration consequences, which rendered due process analysis at best a poor fit. The court concluded that there was not the same "close connection" between the child rape conviction and the civil consequence of commitment as an SDP. Id. at 363 & n.9. This is because prosecutors retain discretion whether to seek SDP

argument that, by making passing references to immigration consequences as no longer being considered collateral, the Supreme Judicial Court intended to sweep due process analysis into the calculus.

Regardless of whether some immigration consequences in some contexts might so inexorably flow from a guilty plea as to render such consequences "direct" for purposes of the due process clause, a question we need not reach, the immigration consequences here plainly do not qualify. As detailed above, whether the juvenile would be deported hardly flowed directly from his being adjudicated a youthful offender.[19] Rather, the juvenile's plea, and the conduct underlying that plea (which the juvenile independently acknowledged during the immigration proceedings) were treated as negative factors in the immigration judge's decision whether to grant the discretionary relief that the juvenile had sought. Under these circumstances, deportation was no more a direct consequence of the juvenile's plea than the SDP determination was in Roberts.

---

confinement and are required to prove additional elements in order to do so. Id. at 363.

[19] In fact, because a youthful offender adjudication is not even considered a conviction for immigration purposes, that means that the juvenile's pleas were not in and of themselves a basis for deportation.

None of this is to suggest that the juvenile would have had a strong due process argument if such analysis applied to the immigration consequences of his youthful offender plea. Although he testified at the evidentiary hearing that at the time of the plea, he was unaware that his "plea could lead to [him] being sent back to Brazil" and "that by admitting to certain crimes, [he was] making it much harder to stay in the United States," the judge did not credit that testimony. Putting aside that credibility determinations are the province of trial court judges, we note that there was robust evidence in the record, such as the social worker's notes and plea counsel's testimony, that established that the juvenile was well aware that he faced likely deportation if he pleaded to being a youthful offender.[20]

---

[20] With respect to the juvenile's arguments that he was a juvenile with an underdeveloped brain, the motion judge "acknowledge[d] that a juvenile's brain is still developing, and that this fact justifies differential treatment of juveniles and adults by the criminal justice system." See Commonwealth v. Mattis, 493 Mass. 216, 217-218, 226 (2024) (holding that youth and emerging adults require greater protections during sentencing due to differences in brain development and maturation compared to adults). However, the motion judge went on to reason that "this applies to all juveniles and does not provide a basis to claim that a guilty plea by a[n] [individual] juvenile was not knowing and intelligent." We discern no error in that conclusion or in the judge's finding that this juvenile knowingly entered his plea. See Yardley Y., 464 Mass. at 230 n.11 (although "special caution" is required "when reviewing juvenile's decision to waive a right," "we defer to the judge who bears the responsibility to ensure the defendant has made a knowing and voluntary waiver").

For these reasons, we conclude that the judge did not abuse his discretion or otherwise err in denying the juvenile's motion to withdraw guilty plea.

Conclusion.  The order denying the juvenile's motion to withdraw guilty plea, and the order denying the juvenile's motion to reconsider, are affirmed.

So ordered.